[Civ. No. 16483. Fourth Dist., Div. One. Jan. 31, 1979.]

In re the Marriage of TALLULAH and JOSEPH WILLIAM LONTOS.
TALLULAH LONTOS, Respondent, v.
JOSEPH WILLIAM LONTOS, Appellant.

**COUNSEL**

Hunter & Ryan and Daniel B. Hunter for Appellant.

Deborah L. Schowalter for Respondent.

**OPINION**

**STANIFORTH, J.**—Joseph William Lontos (husband) appeals from an order denying his motion "to partially vacate" a 1970 interlocutory judgment of dissolution. He asserts the provisions requiring him to pay child and spousal support to Mrs. Lontos (wife) are void—entered without personal jurisdiction over him.

## THE FACTS

The Lontoses first met in 1956 when living in San Diego, California. They married in 1961. The husband was in the United States Marine Corps. Shortly after the marriage, he was transferred to Lejeune, North Carolina. The wife traveled with the husband to Lejeune but within a one-year period returned to San Diego when her husband went to Okinawa. While living in North Carolina during this first year of their marriage, the parties executed wills indicating they were residents of San Diego, California. In 1963 the husband returned to San Diego where the Lontoses thereafter lived until 1969. They purchased a home in Chula Vista, California, voted, paid taxes in California and had California drivers' licenses. One of their three children was born in California.

In 1969 husband was, by military order, transferred to Albuquerque, New Mexico. The wife and three children traveled with the husband to Albuquerque and took up residence on a military post. The husband concedes he was then a domiciliary of the State of California.

On New Year's Day 1970, the husband abandoned the wife and the three children with all of $10 for their support. The wife was told by the military officials on the base that she and the children would have to move from military housing since the husband was no longer in residence. In this factual context the wife and three children returned to the family home in San Diego. In January 1970, the wife filed dissolution proceedings in the San Diego Superior Court. In the meantime, the husband filed for divorce in New Mexico but did not pursue the matter and his complaint was dismissed for lack of prosecution. However, prior to dismissal of his first action, the husband filed a second complaint for divorce in Bernalillo County, New Mexico. The wife appeared through counsel in this second action, filed an answer admitting the allegations contained in the husband's complaint to the effect that he was a resident of Bernalillo County, New Mexico. A final decree of divorce was entered in this New Mexico action on April 16, 1971.

Concurrent with the New Mexico actions, the wife (on Jan. 18, 1970) in connection with her California dissolution proceedings obtained an order for publication of summons and an order to show cause seeking among other things support for herself and the three minor children. The husband was personally served with summons, petition and order to show cause in New Mexico. The husband did not appear at the order to show cause hearing, whereupon the court ordered the defaulting husband to pay $100 per month spousal support and the further sum of $100 per month for each of the three minor children, together with attorney fees and court costs. Thereafter, upon the husband's default being entered, an interlocutory judgment of dissolution was entered April 30, 1970. The decree dissolved the marriage, granted custody of the minor children to the wife and ordered the husband to pay child support and spousal support in the same amount as set in the temporary order. The husband had not provided any support for his family since the New Year's Day separation and has refused to comply with this order for child and spousal support. As a result of this nonsupport, the wife sought and obtained welfare aid for herself and the children for the period of March-June 1970.

In 1971 the wife by a second order to show cause sought to impress a lien upon the parties' Chula Vista property to secure payment of accrued unpaid child and spousal support. The husband was personally served from New Mexico with appropriate documents but failed to appear. Upon his default, the California superior court impressed a lien upon the property.

Four years later, September 5, 1975, the wife obtained a writ of execution against the husband for his default in paying support. The amount found to be due was $16,956.61. Execution proceedings against the husband's retirement pension was commenced to satisfy this order. A further writ of execution was issued on August 4, 1976, for a sum owing in the amount of $19,342.41.

On July 9, 1976, the wife, by order to show cause, sought increased support payments, attorney fees and costs and an assignment of wages for a federal levy on the husband's retirement pension. Again the husband was personally served with the appropriate documents in Bernalillo County, New Mexico. In response to this last effort, the husband appeared specially, moved to vacate those portions of the 1970 interlocutory judgment ordering him to pay child and spousal support. He asserted the California court never obtained personal jurisdiction over him. After

a contested evidentiary hearing (the matter was by stipulation submitted to the court upon the declarations of the parties together with points and authorities), the court denied the husband's motion.

The husband admits the trial court had the "power to adjudicate the status of the marriage of the parties, custody of the children, and to divide the assets of the parties physically located within the state of California." He claims to have been a resident of New Mexico, not of California. In addition, he contends he lacked sufficient "minimum contact" with the latter state (citing *Internat. Shoe Co.* v. *Washington,* 326 U.S. 310, 316 [90 L.Ed. 95, 102, 66 S.Ct. 154, 161 A.L.R. 1057]) to warrant California's exercise of personal jurisdiction over him.

■ California Code of Civil Procedure section 410.10 permits California courts to exercise judicial jurisdiction over an individual "on any basis not inconsistent with the Constitution of this state or of the United States." In section 410.10, the California Legislature manifested an intent to include all required bases of judicial jurisdiction and authorized the courts of California to utilize such bases limited only by constitutional considerations. (*Sibley* v. *Superior Court,* 16 Cal.3d 442, 445 [128 Cal.Rptr. 34, 546 P.2d 322].) This language incorporates, reaffirms the due process clause of the 14th Amendment as a limitation on any attempt of exercise of jurisdiction by a California court to enter a judgment affecting rights or interests of nonresident defendants. (*Kulko* v. *California Superior Court* 436 U.S. 84 [56 L.Ed.2d 132, 98 S.Ct. 1690, 1696].)

■ Under federal constitutional standards here controlling, a judgment imposing a personal obligation upon a defendant may be entered only by a court having jurisdiction over the person of that defendant. (*Internat. Shoe Co.* v. *Washington, supra,* 326 U.S. 310, 316.) The existence of personal jurisdiction conformable to due process concepts depends in the first instance upon reasonable notice to the defendant that the action has been brought. (*Mullane* v. *Central Hanover Tr. Co.,* 339 U.S. 306, 313 [94 L.Ed. 865, 872-873, 70 S.Ct. 652, 656, 657].) This requisite of jurisdiction is not in contest here, for the husband was properly served in New Mexico with the appropriate documents.

The second mandated constitutional standard for determining whether a California court may enter a binding agreement against the husband here is set forth in *Internat. Shoe Co.* v. *Washington, supra,* at page 316 [90 L.Ed. at page 102], where the United States Supreme Court concluded: "[D]ue process requires only that in order to subject a

defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' "

Chief Justice Stone writing for the majority gave some substance to the minimum contacts test as follows: "But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue." (*Internat. Shoe Co.* v. *Washington, supra,* at p. 319 [90 L.Ed. at p. 104].)

In analysis and definition of the "minimum contacts" rule, we first note that the interests of the forum state and of the plaintiff in the proceeding with the cause in plaintiff's forum of choice are to be considered. (*McGee* v. *International Life Ins. Co.,* 355 U.S. 220, 223 [2 L.Ed.2d 223, 226, 78 S.Ct. 199, 201].) Further an essential criterion in all cases is whether the "quality and nature" of the defendant's activity is such that it is "reasonable" and "fair" to require him to conduct his defense in that state. (*Internat. Shoe Co.* v. *Washington, supra,* 326 U.S. 310, 316-317, 319 [90 L.Ed. 95, 102, 104]; *Shaffer* v. *Heitner,* 433 U.S. 186, 207-212 [53 L.Ed.2d 683, 699-703, 97 S.Ct. 2569].)

The minimum contacts criteria of *International Shoe* was further defined in *Hanson* v. *Denckla,* 357 U.S. 235, 253, 254[2 L.Ed.2d 1283, 1298, 78 S.Ct. 1228, 1239, 1240] where the court indicated that a defendant must have such contacts with the state that it can be said it has been benefited and protected by the laws of that state. Specifically, the United States Supreme Court in *Hanson* v. *Denckla, supra,* at page 253, stated: "The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."

■ Most recently the United States Supreme Court in *Kulko* v. *California Superior Court, supra,* 436 U.S. 84, 92 [56 L.Ed.2d 132, 141, 98 S.Ct. 1690, 1697], added this delphic declaration in its attempt to lend substance to the minimum contacts rule: "Like any standard that requires a determination of 'reasonableness,' the 'minimum contacts' test of *International Shoe* is not susceptible of mechanical application; rather, the facts of each case must be weighed to determine whether the requisite 'affiliating circumstances' are present. [Citation.] We recognize that this determination is one in which few answers will be written 'in black and white. The greys are dominant and even among them the shades are innumerable.' [Citation.]"

In conformity with the foregoing principles, we must examine in an objective sense the extent, the number of the "contacts" of the husband with California. Next we must delve into their nature and quality to ascertain whether he has "purposefully availed" himself of the privilege of conducting activities in California; whether those contacts are such that he has been benefited and protected by the laws of California. We make this search with the ultimate objective in view of answering this question: does the maintenance of the suit "offend traditional notions of fair play and substantial justice"?

■ Preliminarily to this traverse we dispose of domicile of the husband as a basis of jurisdiction. Without factual dispute, the husband admits domicile in California until late 1969. Whether the husband ever became domiciled in New Mexico is in serious dispute. However, the wife admitted his domiciliary status when she appeared by counsel in his New Mexico divorce proceeding. The trial court's finding that the husband was a domiciliary of New Mexico was therefore supported by substantial evidence. We do not disturb this finding.[1]

■ We turn now to examine the quantity, the nature and quality of the husband's California contacts. The last nondisputed marital domicile of the Lontos family was California. After moving in 1969 to the military base in New Mexico, the Lontoses maintained economic and personal ties in California. They jointly owned a home in Chula Vista. The parties empowered a Chula Vista realtor to rent their home and to oversee its maintenance in their absence. They retained a joint bank account in Chula Vista. Both parties left boxes of personal effects at the wife's mother's home in San Diego.

---

[1]We view, as we must, the evidence before the trial court in the light most favorable to the trial court's determination.

The husband was a military man with a long history of domicile in California with not infrequent temporary residence at military establishments outside California. Before moving to New Mexico, the Lontos family had never lived there before or expressed any desire to reside there. The transfer of the husband to New Mexico was not at his request. While in New Mexico, both the husband and the wife expressed an intent to return to San Diego and reside there whenever conditions would allow. The house in New Mexico was rented from the military authority and neither party discussed the purchase of a home in New Mexico even though there were houses for sale near the military base. The parties continued to operate with California drivers' licenses through 1969 and their automobile was licensed in the State of California through that year. The parties established a checking account at a bank on the military base. Neither party left the military base to conduct business except for occasional shopping trips. Two days before the separation of the parties (Dec. 30, 1969), the husband sent the wife's allotment check for deposit to the First National Bank in Chula Vista. The parties prior to moving to New Mexico had been residents of the State of California from at least 1963. One of their children was born in California. Thirteen of the seventeen years of the husband's military service was spent in California. These facts support the trial court's conclusion that the husband's contacts in the State of California were continuous and extensive in nature and continued up to the date of the parties' separation.

We contrast the extent, nature and quality of the contacts between the husband in California with those as found in *Kulko* v. *California Superior Court, supra,* 98 S.Ct. 1690. In *Kulko,* at pages 92-93 [56 L.Ed.2d at pages 141-142, 98 S.Ct. at page 1697], the Supreme Court characterized Kulko's relationship to California as a "glancing presence in the State some 13 years before the events that led to this controversy." Kulko had never resided in California. By a written separation agreement, his daughter and son resided with him in New York during the school year and with his ex-wife in California during vacations. In 1973 his daughter advised Kulko she wanted to live with her mother. He bought her a one-way ticket to California. In 1976 the son informed his mother that he too wanted to live with her in California. She sent him a plane ticket. Shortly thereafter, the wife commenced the California action to establish their Haitian divorce as a judgment of California, seeking custody of the children and increased child support from Kulko. He was served with summons by mail in New York. Kulko did not seek to regain custody of his children.

In this sparse fact setting, the United States Supreme Court said: "A father who agrees, in the interests of family harmony and his children's preferences, to allow them to spend more time in California than was required under a separation agreement can hardly be said to have 'purposefully availed himself' of the 'benefits and protection' of California's laws. [Citation.]" (*Kulko* v. *Superior Court of California, supra,* 436 U.S. 84, 94 [56 L.Ed.2d 132, 142-143, 98 S.Ct. 1690, 1698].)

Said the United States Supreme Court further: "This single act is surely not one that a reasonable parent would expect to result in the substantial financial burden and personal strain of litigating a child-support suit in a forum 3,000 miles away, and we therefore see no basis on which it can be said that appellant could reasonably have anticipated being 'haled before a [California] court,' [citation]." (*Kulko, supra,* 436 U.S. at pp. 97, 98 [56 L.Ed.2d at p. 145, 98 S.Ct. at p. 1700].)

We contrast also the lack of minimal contacts at the factual base of *Titus* v. *Superior Court,* 23 Cal.App.3d 792, 803 [100 Cal.Rptr. 477]; *Judd* v. *Superior Court,* 60 Cal.App.3d 38, 45 [131 Cal.Rptr. 246]; and *Hoerler* v. *Superior Court,* 85 Cal.App.3d 533, 534 [149 Cal.Rptr. 569]. In *Titus* the father had custody of the children under a Massachusetts divorce decree. He sent the children to California to visit their mother for the summer pursuant to a written agreement which required the children be returned to the father in Massachusetts at the end of August. The mother breached the agreement and retained the children and brought action in California. The appeal court properly denied the claim of personal jurisdiction over a nonresident parent in these circumstances. In *Judd* the parties lived in New York and Connecticut until their separation and Mexican divorce decree. The wife moved to California with the minor children in her legal custody. The father never resided in California but visited the children there. Ten years after the Mexican divorce, the mother filed a petition for dissolution in California seeking custody, spousal and child support. The Court of Appeal concluded in this factual situation it was neither fair nor reasonable to uphold jurisdiction over the father merely because he sent support payments to California. In contrast to the lack of even "minimal contacts" of *Kulko, Titus, Judd* and *Hoerler,* the husband's connections to California have extended over many years. They have been and are still continuous and significant in number and nature.

A further "contact" exists supporting the exercise of judicial jurisdiction over the husband. In *Sibley* v. *Superior Court, supra,* 16 Cal.3d 442, 446, our Supreme Court (quoting from the Judicial Council com. to Code

Civ. Proc., § 410.10) said: " 'A state has power to exercise judicial jurisdiction over an individual who causes effects in the state by an omission or act done elsewhere with respect to causes of action arising from these effects, *unless the nature of the effects and of the individual's relationship to the state make the exercise of such jurisdiction unreasonable.* [Citations.]' (Italics added.)"

This "effects" test as an independent basis for exercise of jurisdiction over a nonresident defendant has been placed in judicial limbo by the statement of the United States Supreme Court in *Kulko,* at page 96 [56 L.Ed.2d at page 144, 98 S.Ct. at page 1699]: "While this provision is not binding on this Court, it does not in any event support the decision below. As is apparent from the examples accompanying § 37 in the Restatement, this section was intended to reach wrongful activity outside of the State causing injury within the State, see, e. g., Comment a, p. 157 (shooting bullet from one State into another), or commercial activity affecting state residents, *ibid.* Even in such situations, moreover, the Restatement recognizes that there might be circumstances that would render 'unreasonable' the assertion of jurisdiction over the nonresident defendant."

In view of that dampening language of *Kulko,* we examine the husband's action in New Mexico by reason of its evidentiary value, as proof of a purposeful causing of an effect creating a meaningful substantial contact in California differing only quantitatively from the hypothetical shooting of a bullet across a state line into California.

The husband abandoned his wife and three children on the military base in New Mexico. He was the sole source of support of the family but left them with all of $10. The military authorities refused to permit the wife and the children to continue to occupy the premises on the base by reason of the husband's departure. In these circumstances the wife and children were effectively compelled by the husband's acts to return to the family home, family possessions and family contacts in California. As a direct result of the husband's abandonment and failure to provide, the wife sought and received welfare monies from the State of California. The husband's acts can be most reasonably viewed as purposeful, willful, done with full awareness in contemplation of the harm that would be effected in the State of California.

We conclude that substantial evidence supports the trial court's finding that the multiplicity of contacts as well as the "effects" of the husband's

purposeful acts on California point to and support its exercise of personal jurisdiction over him.

But we must touch one further constitutional base. The mere aggregation of the recited minimal contacts and the husband's willful causing of an effect in California is not sufficient to supply constitutional basis for jurisdiction. The assertion of jurisdiction over a nonresident defendant must be reasonable. (*Kulko* v. *California Superior Court, supra,* at p. 1699.) The husband's activities must be of such quality and nature that it is "reasonable" and "fair" to require him to conduct his defense in California. Maintenance of the suit should not offend " 'traditional notions of fair play and substantial justice.' " (*Internat. Shoe Co.* v. *Washington, supra,* at pp. 316, 317 [90 L.Ed. at p. 102].)

The husband compelled his wife and children to move to seek the protection of California laws. The husband by his willful acts put the burden of support of his three children on the taxpayers of California. Most certainly the husband did "purposely derive a benefit from his activities relating to California." California has a substantial and a continuing interest in the protection of its resident children and to facilitate child support actions on behalf of those children. These are children of a military family who have for many years been residents of this state and California's interest has not been lost by the temporary sojourn of their parents in the military post in another state. In such factual contrast, it is most fair and reasonable, it does not offend traditional notions of fair play and substantial justice to require the husband to make a defense in the California lawsuit. If we doubt that California is that fair forum, consider the alternative. We would require a wife and family who have been deserted and left without funds and without a home to remain in or return to New Mexico, at most a state of a temporary military abode, to litigate and enforce her and her children's right to support. Such prospect is most unreasonable. It is not fair play.

Judgment affirmed.

Cologne, Acting P. J., concurred.

**WIENER, J.**—I concur in the judgment of the majority that the California court has personal jurisdiction over Mr. Lontos with reference to child and spousal support. I feel it is necessary, however, both for the guidance of the trial court and the parties concerned, to discuss the practical effect of our decision. Undoubtedly, now that the academic

question of jurisdiction has been answered, Mrs. Lontos will seek a writ of execution to obtain the funds due for support under the court orders. For the reasons which I will discuss, I believe enforcement of the child and spousal support provisions of both the interlocutory judgment of dissolution and the order of September 14, 1976, should be stayed until the trial court can properly exercise its discretion under Civil Code section 4380.[1]

An order for either accrued spousal or child support does not issue as a matter of right, for the trial court has discretion to determine whether execution is an appropriate remedy in a particular case. (6 Witkin, Summary of Cal. Law (8th ed. 1974) Husband and Wife, Execution, § 172, p. 5042.) Whether a court should exercise its discretion may turn on many considerations. (See, e.g., *Parker* v. *Parker* (1928) 203 Cal. 787, 793-794 [266 P. 283]; *Messenger* v. *Messenger* (1956) 46 Cal.2d 619, 630 [297 P.2d 988]; *Kaminski* v. *Kaminski* (1970) 8 Cal.App.3d 563 [87 Cal.Rptr. 453].) It is necessary that the trial court have all relevant information affecting the cause before the exercise of discretion. To determine what may be relevant in the case at bench, a review of the procedural background is necessary.

Mrs. Lontos filed her petition for dissolution in California on January 16, 1970. Her husband was personally served on January 19, 1970, and her request to enter his default was filed April 15, 1970. On April 30, 1970, Mrs. Lontos obtained an interlocutory judgment of dissolution which provided for child support for each child in the sum of $100 monthly and spousal support in the same amount for a total of $400 monthly. Mr. Lontos was in the military service and did not appear in the action.[2]

Mr. Lontos filed two actions for divorce in New Mexico. The first, filed January 9, 1970, was dismissed; the second action was filed March 12,

---

[1]Civil Code section 4380 provides: "Any judgment, order, or decree of the court made or entered pursuant to this part may be enforced by the court by execution, the appointment of a receiver, contempt, or by such other order or orders as the court in its discretion may from time to time deem necessary."

[2]The procedure used in obtaining the default judgment against Mr. Lontos was not in compliance with the Soldiers' and Sailors' Relief Act of 1940 as amended. (50 U.S.C.A. § 501 et seq.) Neither an affidavit (declaration) was filed showing Mr. Lontos not to be in the service nor was an attorney appointed on his behalf. (50 U.S.C.A. Appen., § 520.) Although the failure to appoint an attorney does not render the judgment void, only voidable (*Allen* v. *Allen* (1947) 30 Cal.2d 433, 435-436 [182 P.2d 551]), it is difficult to ignore the effect of the statute when use of the court's processes are being considered. There was also failure to comply with California Rules of Court, rule 1286. Notice of his default was not mailed to Mr. Lontos at his known address. The notice furnished was to his attorney of record in his New Mexico action for divorce.

1970. Mrs. Lontos appeared through her attorneys on May 15, 1970, and permitted judgment to be entered on April 16, 1971. The judgments which her counsel approved as to form expressly stated there was no alimony and provided for total child support in the sum of $200 monthly. Her answer to the New Mexico action, filed after the entry of the California judgment, made no reference to the California judgment.

The New Mexico judgment may have considerable significance for, as a general rule, where two successive actions involving the same issue are filed in courts of concurrent jurisdiction, the first final judgment is conclusive. (4 Witkin, Cal. Procedure (2d ed. 1970) Judgment, § 166, pp. 3308-3309.) However, the res judicata effect of the first final judgment may be lost if a party having the opportunity to do so fails to raise it as a bar in the other action. (See *Harley* v. *Superior Court* (1964) 226 Cal.App.2d 432, 436 [38 Cal.Rptr. 72].) It appears from this record the New Mexico judgment has become final and there is no reason to deny it full faith and credit. Whether the foreign judgment is valid or whether it has any effect on the California judgment are questions which cannot be resolved by this court at this stage of the proceedings; nevertheless, the existence of the foreign judgment should be drawn to the attention of the trial court to permit a judicial determination as to the legal effect of the foreign judgment on the California orders.

Lawyers practicing family law and judges who are called upon to sign the countless writs of execution for accrued support are keenly aware of the need for candor in the applications which accompany requests for the issuance of writs of execution. As officers of the court, lawyers may "never . . . seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law." (Bus. & Prof. Code, § 6068, subd. (d).) Any type of deceit by an attorney is reprehensible misconduct whether or not harm results and regardless of the existence of any motive for personal gain. (See *Sullins* v. *State Bar* (1975) 15 Cal.3d 609, 622 [125 Cal.Rptr. 471, 542 P.2d 631].) It is imperative that lawyers, particularly in ex parte matters, perform their role in the administration of justice.

I agree with the majority that Mr. Lontos' connection with the State of California was not too attenuated under the standards of reasonableness and fairness to require him to conduct any defense that he may have had in California. I do not agree, however, with the conclusion that his acts were done with his full awareness of the harm that would be effected in California. The issue of marital discord and the cause of Mrs. Lontos' leaving New Mexico were raised in the respective declarations filed by

the parties. Findings on the issue of abandonment were neither essential to the trial court judgment nor were they made. Consequently, on this record, I am unable to join with the majority on the cause and effect basis for the exercise of personal jurisdiction by the California court.