[Civ. No. 50643. First Dist., Div. One. June 30, 1981.]

LYNN E. McGLOTHEN, Petitioner, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY OF
SAN FRANCISCO, Respondent;
BRENDA McGLOTHEN, Real Party in Interest.

COUNSEL

Lawrence H. Stotter and M. Dee Samuels for Petitioner.

No appearance for Respondent.

Spiering, Scherzer & Swartz, Andrew H. Swartz, John I. Wieben and Meheen, Menken & Wieben for Real Party in Interest.

OPINION

**ELKINGTON, J.**—On the petition of Brenda McGlothen (hereafter for convenience and clarity, Brenda) seeking, along with other relief, child and spousal support from her husband, Lynn E. McGlothen (hereafter for similar reasons, Lynn), he made a special appearance objecting to the jurisdiction of the superior court. No contention was made that he had not been properly served with appropriate process; instead it was argued that he, a nonresident of California, was not subject to the jurisdiction of its courts under the "long arm" statute of Code of Civil Procedure section 410.10.

Following a hearing, the superior court entered an order that Lynn's "Motion to Quash for lack of jurisdiction is denied; . . ."

Upon Lynn's petition we issued an alternative writ of mandate in order to determine the validity of that order.

The superior court's determination was based upon controverted affidavits of the parties; no oral testimony was produced.

In determining the factual context of the case we are bound by the rule applicable where oral testimony is presented for review. "'When an issue is tried on affidavits, the rule on [review] is that those affidavits favoring the contention of the prevailing party establish not only the facts stated therein but also all facts which reasonably may be inferred therefrom, and where there is a substantial conflict in the facts stated, a determination of the controverted facts by the trial court will not be disturbed.'" (*Lynch* v. *Spilman* (1967) 67 Cal.2d 251, 259 [62 Cal.Rptr. 12, 431 P.2d 636]; and see *Kulko* v. *Superior Court* (1977) 19 Cal.3d 514, 519, fn. 1 [138 Cal.Rptr. 586, 564 P.2d 353] [revd. on unrelated grounds, *Kulko* v. *California Superior Court* (1978) 436 U.S. 84 (56 L.Ed.2d 132, 98 S.Ct. 1690)]; *Griffith Co.* v. *San Diego Col. for Women* (1955) 45 Cal.2d 501, 508 [289 P.2d 476, 47 A.L.R.2d 1349]; *Carruth* v. *Superior Court* (1978) 80 Cal.App.3d 215, 218 [145 Cal.Rptr. 344].)

Obedient to this rule we state the relevant facts as they were presumably found true by the superior court.

Lynn was, and is, a professional baseball player, presently employed by the Chicago National League Ball Club.

Brenda had lived in California her entire life when she met Lynn in 1972. He then played "for the Boston Red Sox and was in California on a road trip." At the end of the baseball season he returned to San Francisco, moving into Brenda's apartment. Lynn left for a time that winter to play baseball in Puerto Rico, leaving his automobile and personal effects with Brenda. The parties' plans to marry were postponed when Brenda learned that Lynn was already married and had a child. Upon the opening of the 1973 baseball season the two moved to Boston where they cohabited until Lynn's trade to St. Louis, where they continued living together. In November 1974, Lynn had become divorced, and the couple was married. A year later Brenda gave birth to their first child. In December 1976, Lynn "was traded to the San Francisco Giants," and the couple moved back to San Francisco. They "found" a home in Foster City and moved into it with their child.

During the 1977 "spring training" period Lynn assaulted Brenda, blackening her eyes, as a result of which she returned to Foster City alone. Lynn joined her upon the baseball season's commencement, and they continued their family life together until June of 1978, when he was traded to the "Chicago Cubs." Upon Brenda's plan to join him in Chicago, as declared by her, Lynn "instructed me to first go to a trailer home in Simsboro, Louisiana, until he could find a place for the family to reside in or about the Chicago area. Thus, in July, 1978, I moved from Foster City, California, into a trailer home in Simsboro, Louisiana, with the full understanding that this was a very temporary arrangement and I would move to Chicago or elsewhere as soon as a home was located. We left certain personal effects in California. . . . Thereafter, through the summer of 1978 and 1979, I visited [Lynn] in Chicago, who had moved into the Beldon Stratford Hotel. Each time I visited [Lynn] in Chicago, Illinois, [he] assured me that he was continuing his search for a place for the family to reside in Chicago and that I should remain living with his family on a temporary basis in Simsboro, Louisiana, due primarily to its close proximity to Chicago. We initially stayed in [Lynn's] mother's home in Simsboro before moving to a trailer. We did not own a home in Louisiana or anywhere else." In Louisiana there were "many incidents of violence" by Lynn against Brenda. He closed their joint checking and savings accounts. He then, she said: "completely refused to support me and our children, even though I was pregnant and about to have our second son." When the child was born Lynn asked her to leave. For that reason, and because of his continued violence when he came to Louisiana, and "because my children and I had no funds on which to live, . . . I fled Simsboro, Lou-

isiana, with my children, returning to San Francisco, California, where I moved in again with my parents at their . . . San Francisco, California, home . . . ."

Under Lynn's contract with the Chicago National League Ball Club, he received a bonus of $200,000 on or about October 31, 1979, and has been paid and is now being paid a salary of $200,000 yearly. Brenda declared: "I am destitute and without money. In spite of the fact that [Lynn] will earn approximately $400,000, he has not sent us any money and has threatened to quit baseball before I would get a dime. It will therefore be necessary for me and my children to obtain public assistance benefits in San Francisco." (An assertion of Brenda's briefs that she, and her and Lynn's children, are presently supported by public welfare grants, has gone unchallenged by Lynn.)

■ Code of Civil Procedure section 410.10, as is now well known, provides that: "A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States."

A leading authority of the state on the subject is *Cornelison* v. *Chaney* (1976) 16 Cal.3d 143 [127 Cal.Rptr. 352, 545 P.2d 264]. It states (p. 147) that: "[T]he United States Supreme Court has defined the parameters of the power of the states to compel nonresidents to defend suits brought against them in the state's courts. . . . The general rule is that the forum state may not exercise jurisdiction over a nonresident unless his relationship to the state is such as to make the exercise of such jurisdiction *reasonable.*" (Italics added.) A contemporary authority, *Sibley* v. *Superior Court* (1976) 16 Cal.3d 442 [128 Cal.Rptr. 34, 546 P.2d 322] (cert. den., 429 U.S. 826 [50·L.Ed.2d 89, 97 S.Ct. 82]), elaborated:

"One of the recognized bases for jurisdiction in California arises when the defendant has caused an 'effect' in the state by an act or omission which occurs elsewhere." (P. 445.) "The mere causing of an 'effect' in California, however, . . . is not necessarily sufficient to afford a constitutional basis for jurisdiction; notwithstanding this 'effect,' the imposition of jurisdiction may be 'unreasonable'" (p. 446) and thus constitutionally improper.

Even higher authority, *World-Wide Volkswagen Corp.* v. *Woodson* (1980) 444 U.S. 286, 292 [62 L.Ed.2d 490, 498, 100 S.Ct. 559, 580],

instructs that the required "reasonableness" is such as "'does not offend "traditional notions of fair play and substantial justice."'" And *Kulko* v. *California Superior Court, supra*, 436 U.S. 84, 92 [56 L.Ed.2d 132, 141], teaches that the "reasonableness" test "is not susceptible of mechanical application; rather, the facts of each case must be weighed to determine whether the requisite 'affiliating circumstances' are present.... We recognize that this determination is one in which few answers will be written 'in black and white. The greys are dominant and even among them the shades are innumerable.'"

■ *Kulko* itself illustrates a case where imposition, in what might be called a family relation action, of a state's judicial forum upon an objecting nonresident defendant was manifestly *"unreasonable."* There the out-of-state defendant "did no more than acquiesce in the stated preference of one of his children to live with her mother in California." Noting that the defendant father had derived no personal benefit "from his child's presence in California" that "would make fair the assertion of that State's judicial jurisdiction," the high court held (436 U.S., at p. 94 [56 L.Ed.2d at p. 142]): "We cannot accept the proposition that [the defendant's] acquiescence in Ilsa's desire to live with her mother conferred jurisdiction over [him] in the California courts in this action."

A lesser authority, illuminative of the other end of *Kulko*'s spectrum, is this state's *In re Marriage of Lontos* (1979) 89 Cal.App.3d 61 [152 Cal.Rptr. 271]. There, as found by the trial and reviewing courts (p. 71): "The husband [a military man] abandoned his wife and three children on the military base in New Mexico. He was the sole source of support of the family but left them with all of $10. The military authorities refused to permit the wife and the children to continue to occupy the premises on the base by reason of the husband's departure. In these circumstances the wife and children were effectively compelled by the husband's acts to return to the family home, family possessions and family contacts in California. As a direct result of the husband's abandonment and failure to provide, the wife sought and received welfare monies from the State of California. The husband's acts can be most reasonably viewed as purposeful, willful, done with full awareness in contemplation of the harm that would be effected in the State of California."

Holding that the superior court had jurisdiction, over the husband's objection, to enter an in personam judgment for child and spousal sup-

port, the *Lontos* court opined (89 Cal.App.3d, p. 72): "The husband compelled his wife and children to move to seek the protection of California laws. The husband by his willful acts put the burden of support of his three children on the taxpayers of California. Most certainly the husband did 'purposely derive a benefit from his activities relating to California.' California has a substantial and a continuing interest in the protection of its resident children and to facilitate child support actions on behalf of those children. These are children of a military family who have for many years been residents of this state and California's interest has not been lost by the temporary sojourn of their parents in the military post in another state. In such factual contrast, it is most fair and reasonable, it does not offend traditional notions of fair play and substantial justice to require the husband to make a defense in the California lawsuit. If we doubt that California is that fair forum, consider the alternative. We would require a wife and family who have been deserted and left without funds and without a home to remain in or return to New Mexico, at most a state of a temporary military abode, to litigate and enforce her and her children's right to support. Such prospect is most unreasonable. It is not fair play."

■ In light of the foregoing authority, and the factual context as found in the case at bench by the superior court, it reasonably concluded that Lynn's acts and omissions outside of California were such as caused an *effect in this state* far more in the nature of *Lontos* than of *Kulko.* His wife and children, as a result of his conduct in Louisiana, were there left destitute by him and obliged to return to her parents' home in California, where they are now supported by the taxpayers of this state or parental bounty. And they were, and are, without funds for travel to, or litigation of their right to support in, Louisiana. Moreover, Lynn may reasonably be said to have derived a *personal benefit* from their presence in this distant state, for throughout the past several years he had *not* been supporting Brenda and his children because, paraphrasing *Kulko* (436 U.S., p. 97 [56 L.Ed.2d, p. 145]), he had imposed upon Brenda, in this state, the insurmountable "financial burden and personal strain of litigating a [spousal and] child-support suit in a forum [thousands of] miles away, . . ."

For those and other reasons appearing in our factual recital, it was *reasonable*, and thus according to constitutional standards, for the superior court to assume jurisdiction over Lynn in Brenda's action.

The peremptory writ of mandate is denied, and the alternative writ is discharged.

Racanelli, P. J., and Grodin, J., concurred.

A petition for a rehearing was denied July 28, 1981, and the opinion was modified to read as printed above. Petitioner's application for a hearing by the Supreme Court was denied, August 26, 1981.