[Nos. A040681, A041494. First Dist., Div. Four. Sept. 29, 1988.]

MOHAMMAD ALI KHAN, Petitioner, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
ABIDA SALTANA KHAN, Real Party in Interest.

**COUNSEL**

Richard Sherman, De Goff & Sherman, C. Rick Chamberlin and Stotter, Samuels & Chamberlin for Petitioner.

No appearance for Respondent.

Lawrence W. Thorpe, Dowgialo & Wolf and Bernard N. Wolf for Real Party in Interest.

**OPINION**

**POCHÉ, J.**—Mohammad Ali Khan petitions for a writ of mandate commanding respondent court to: (1) vacate its order denying his motion to quash the service of summons in the action commenced by real party in interest Abida Saltana Khan for legal separation, spousal support, and property division, (2) enter an order quashing service, and (3) vacate an order directing petitioner to pay real party in interest specified sums for spousal support, attorneys' fees, and an advance against her expected divisional share of community property. The question presented is whether, consistent with the due process clause of the United States Constitution—particularly as construed in *Kulko* v. *California Superior Court* (1977) 436 U.S. 84 [56 L.Ed.2d 132, 98 S.Ct. 1690], California can exercise personal jurisdiction over petitioner, who has been residing in Saudi Arabia since 1974. We hold that the exercise of jurisdiction is appropriate.

### BACKGROUND AND PROCEDURE

 Respondent court's decision to deny petitioner's motion to quash was made on the basis of declarations and attached exhibits, which are the sources of the following recital of salient events and circumstances: [1]

---

[1] " ' "An appellate court will not disturb the implied findings of fact made by a trial court in support of an order, any more than it will interfere with express findings upon which a final judgment is predicated. When the evidence is conflicting, it will be presumed that the court found every fact necessary to support its order that the evidence would justify. So far as it has passed on the weight of evidence or the credibility of witnesses, its implied findings are conclusive. This rule is equally applicable whether the evidence is oral or documentary. In

Petitioner and real party separately came to the United States from Pakistan in the early 1950's. In 1957, after graduating from college in North Carolina, real party married petitioner in a civil ceremony conducted in Oklahoma, where petitioner was in the process of obtaining a graduate degree in petroleum engineering. That same year they moved to California, where petitioner began working for a petroleum company. Immediately upon their arrival in California, petitioner and real party had their marriage solemnized in a religious ceremony performed at an Islamic mosque. The family settled in Southern California, where real party taught school. Petitioner and real party opened a joint checking account at a San Francisco bank in 1957. The following year real party opened a separate account at a credit union in Santa Ana.

From 1958 to 1961 petitioner was in Pennsylvania completing a Ph.D. in petroleum engineering. In 1961 petitioner returned to California, where he and real party lived continuously until 1967. Daughters were born to the couple in 1962 and 1963. Petitioner and real party became United States citizens in 1964. Two years later they purchased a home in Fullerton.

In 1967 petitioner accepted a job with Oasis Oil Company (Oasis) in Libya. The family moved to Libya in 1968 (where a son was born that year) and remained there until petitioner was abruptly forced to leave the country in 1974. As stated by real party in her declaration and accepted by respondent court (see fn. 4 and accompanying text, *post*): "Oasis Oil Company required that we take a 'repatriation leave' every other year to our place of permanent residence. That residence was California." The family returned to California on "repatriation leave" three times. In addition, as stated by petitioner in one of his declarations: "During the summer of 1974, my children and I took a vacation during which we visited the USA, including a visit with friends in California for approximately one month."

---

the consideration of an order made on affidavits involving the decision of a question of fact, the appellate court is bound by the same rule as where oral testimony is presented for review." [Citations.] When an issue is tried on affidavits, the rule on appeal is that those affidavits favoring the contention of the prevailing party establish not only the facts stated therein but also all facts which reasonably may be inferred therefrom, and where there is a substantial conflict in the facts stated, a determination of the controverted facts by the trial court will not be disturbed.' " (*Kulko* v. *Superior Court* (1977) 19 Cal.3d 514, 519, fn. 1 [138 Cal.Rptr. 586, 564 P.2d 353] [citing and quoting *Griffith Co.* v. *San Diego Col. for Women* (1955) 45 Cal.2d 501, 507-508 [289 P.2d 476, 47 A.L.R.2d 1349], revd. on other grounds *Kulko* v. *California Superior Court, supra,* 436 U.S. 84.) These principles also govern review of orders decided on declarations. (See *Shamblin* v. *Brattain* (1988) 44 Cal.3d 474, 479 [243 Cal.Rptr. 902, 749 P.2d 339]; *Zirbes* v. *Stratton* (1986) 187 Cal.App.3d 1407, 1412 [232 Cal.Rptr. 653]; *Kroopf* v. *Guffey* (1986) 183 Cal.App.3d 1351, 1356 [228 Cal.Rptr. 807]; *Mihlon* v. *Superior Court* (1985) 169 Cal.App.3d 703, 710 [215 Cal.Rptr. 442].) The narrative in the text conforms to these principles.

Together with "all of our belongings," the family returned to California briefly in 1974. While petitioner looked for work, the couple purchased two parcels of unimproved real property near Palmdale. That same year, petitioner was hired by the Arabian American Oil Company (Aramco) and was sent to Saudi Arabia. The family lived in Saudi Arabia until 1987 when the couple separated.[2] Twice during this period (in 1978 and 1981) real party traveled to California using airline tickets provided her by petitioner. Petitioner returned to California in 1982 and 1986.

During their 13-year stay in Saudi Arabia petitioner and real party had further contacts with California. Their home in Fullerton was sold in 1977; the proceeds were apparently divided equally, with petitioner's half deposited into the San Francisco checking account (which was now solely in petitioner's name) and real party's half deposited into her credit union account. However, they retained ownership of the Palmdale property. The last year for which petitioner filed a California income tax return was 1967. According to an August 1987 communication from Aramco, petitioner's "permanent place of residence is Fullerton, California." At all times petitioner maintained a California driver's license. He renewed the license in 1981 and 1985. These licenses listed two addresses, one in Saudi Arabia and one in Fullerton (presumably the family's former home). His current license lists addresses in Saudi Arabia and Azusa (the latter is apparently the residence of friends with whom petitioner maintains close relations).

When the couple separated, real party returned to California using an airline ticket provided by petitioner. On July 10, 1987, she filed a petition for legal separation and sought spousal support, attorneys' fees, and a determination of property rights. Respondent court filed a temporary restraining order preventing petitioner from disturbing or disposing of property that might be subject to division. Petitioner was personally served in Saudi Arabia. Making a special appearance to contest jurisdiction (Code Civ. Proc., § 418.10;[3] Cal. Rules of Court, rule 1234), petitioner moved to quash service on the ground that he did not have the requisite contacts with California to justify the exercise of personal jurisdiction over him. He argued that he had not resided in California for 21 years and that his only visits since 1967 were through the state while vacationing in the United States.

---

[2] Real party declared that petitioner "expelled [her] from the employee compound in Saudi Arabia on January 28, 1987, with the intended effect of sending her back to California without any means of supporting herself, dependent on friends and family for her shelter and food." He obtained a Saudi Arabian divorce by saying "I divorce you" three times in a Saudi Arabian court in the presence of witnesses which did not include real party.

[3] Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure.

Petitioner's motion was the subject of a hearing, at the conclusion of which respondent court denied the motion on the ground that the following constituted sufficient California contacts: (1) petitioner's California residency when recruited for his employments abroad, (2) the birth and upbringing in California of two of the couple's children, (3) petitioner's California driver's license, (4) petitioner's maintenance of the San Francisco bank account, and (5) the couple's ownership of the Palmdale property and the "payments [made] on it." ▪ ▪▪▪▪ Respondent court subsequently, pursuant to real party's request, and at the same time it made the spousal support order, executed a detailed statement of decision which was filed in conjunction with the formal order denying petitioner's motion.[4] Petitioner thereafter filed this timely petition for mandate. (§ 418.10.)

---

[4] Fully half of petitioner's memorandum of points and authorities in support of his petition is devoted to attacking the statement of decision. As he sees it, the oral ruling announced by respondent court (which the court did term "a statement of decision") at the conclusion of the hearing was conclusive and could not be expanded or augmented by the written document subsequently filed. Petitioner argues that the written statement of decision is an illegitimate nullity and must be ignored as unauthorized by section 632 and the enabling provisions of rule 232 of the California Rules of Court. Petitioner claims that neither the statute nor the rule "provides a procedure for written objections to a proposed statement of decision and a hearing to settle conflicts," with the consequence that "the losing party has no meaningful opportunity to prevent the prevailing party from vastly overreaching." A variety of reasons convinces us that petitioner's objections cannot prevail.

First, although it is clear respondent court had no obligation to honor real party's request for a statement of decision regarding the denial of petitioner's motion to quash (see *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1294 [240 Cal.Rptr. 872, 743 P.2d 932]; but cf. *In re Marriage of Stitch* (1985) 169 Cal.App.3d 64, 76 [214 Cal.Rptr. 919] [intimation that statement of decision would be warranted "given the irreconcilable factual conflicts in the declarations submitted in support of and in opposition to [a] motion to quash"]), no authority has been cited for the proposition that the court was powerless to file such a statement. Section 632 and California Rules of Court, rule 232, are directed to situations where a statement of decision is required; they do not limit situations where a statement of decision can be permitted.

Section 632 provides, among other things, that "when the trial is concluded within one calendar day or in less than 8 hours over more than one day, the statement of decision may be made orally on the record in the presence of the parties." A reasonable implication of the fact that a statement of decision *may* be oral is that it may also be in writing. An oral ruling followed by a written statement of decision makes the initial ruling nothing more than a tentative decision within the meaning of California Rules of Court, rule 232. The rule expressly provides that a tentative decision "shall not be binding on the court" and may be modified or changed. (Cal. Rules of Court, rule 232(a); see *Ripani v. Liberty Loan Corp.* (1979) 95 Cal.App.3d 603, 614 [157 Cal.Rptr. 272]; 7 Witkin, Cal. Procedure (3d ed. 1985) Trial, §§ 374 [p. 380], 395 [p. 402].) Even if respondent court's oral pronouncement is to be treated as the more formal statement of decision, it would not limit the court's freedom of action. (See *Phillips v. Phillips* (1953) 41 Cal.2d 869, 874 [264 P.2d 926]; *Canal-Randolph Anaheim, Inc. v. Wilkoski* (1978) 78 Cal.App.3d 477, 493-494 [144 Cal.Rptr. 474]; *Solis v. County of Contra Costa* (1967) 251 Cal.App.2d 844, 846-847 [60 Cal.Rptr. 99].)

In terms of the procedural defects petitioner identifies, we rely upon trial courts to notify the parties of any change in an intended decision or statement of decision. (See Cal. Rules of Court, rule 232(a).) Objections could then be made and heard in conformity with California Rules of Court, rules 232(d) and 232(f). Here, petitioner had the opportunity to advise respondent court of the perceived infirmities of the written statement of decision when the

REVIEW

■ The due process clause "does not contemplate that a state may make binding a judgment *in personam* against an individual . . . with which the state has no contacts, ties, or relations." (*International Shoe Co.* v. *Washington* (1945) 326 U.S. 310, 319 [90 L.Ed. 95, 104, 66 S.Ct. 154, 161 A.L.R. 1057].) To promote this goal the United States Supreme Court has formulated the principle that "due process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " (*Id.* at p. 316 [90 L.Ed. at p. 102] [citing and quoting *Milliken* v. *Meyer* (1940) 311 U.S. 457, 463 (85 L.Ed.2d 278, 283, 61 S.Ct. 339, 132 A.L.R. 1357)].) Because *Kulko* v. *California Superior Court, supra,* 436 U.S. 84, represents the sole expression by the United States Supreme Court of this principle's application to the context of family law, it warrants detailed examination.

Mr. and Mrs. Kulko, both New York domiciliaries, had been married in 1959 during a three-day stopover in California when the husband was enroute to overseas military duty. After the marriage, the wife returned to New York, as did the husband following his tour of duty. Two children were born to the couple in New York where they resided until 1972. In

matter of the spousal support order was argued. Moreover, petitioner's argument that the court's oral ruling was conclusive is undermined by the fact that he himself submitted a proposed statement of decision for the court's signature.

Second, there is much to commend in the practice of trial courts making the fullest possible explication of their rulings and decisions. This court finds it virtually impossible to conceive of a situation where its task of informed review would not be measurably assisted by having the most detailed statement of a lower court's reasoning behind a decision we are asked to overturn. If a trial court, in addition to managing its inevitably congested calendar, conscientiously takes the time and trouble to explain the basis for a particular decision, this inures to the benefit of all concerned. The losing party is better able to evaluate the prospects for review. The prevailing party is better able to defend its victory. The reviewing court has a fuller appreciation of the action it must either sustain or reject. (Cf. *Saleeby* v. *State Bar* (1985) 39 Cal.3d 547, 566-567 [216 Cal.Rptr. 367, 702 P.2d 525].) It seems the height of foolhardiness to discourage a court from advising us and the parties as to the precise grounds for a decision.

Finally, petitioner's arguments seem much ado about nothing. If respondent court had done nothing more than issue an order stating simply that the motion to quash was denied, we would still have to defer to the panoply of respondent court's implicit factual determinations. (See fn. 1, *ante.*) Petitioner is not disadvantaged by our being spared the necessity of undertaking that sort of speculative guesswork. To the contrary, as explained in the preceding paragraph, petitioner's task is made easier by the very clarity of the statement of decision he attacks so vigorously. Our duty would in any event be the same—to determine whether the denial of petitioner's motion is legally sound and supported by the evidence. Our final comment before undertaking that duty is to inform petitioner we shall ignore the evidentiary objections he now makes for the first time. (See Evid. Code, § 353.)

1972, at approximately the same time the couple obtained a Haitian divorce decree, they executed a separation agreement which provided: (1) that the children would remain with their father in New York during the school year but would stay with their mother (who had by now moved to California) during their Christmas, Easter and summer vacations, and (2) that Mr. Kulko would pay Mrs. Kulko $3,000 per year as child support for the periods when the children would be staying with her.

About a year later, the daughter told her father that she wished to live with her mother in California. This she did after Mr. Kulko bought his daughter a one-way airline ticket to California. The Kulkos' son expressed a similar desire in early 1976. This time it was Mrs. Kulko who furnished the airline ticket.

Less than one month after her son's arrival, Mrs. Kulko initiated an action in California seeking increased support and permanent custody of the children. The trial court denied Mr. Kulko's motion to quash. The California Supreme Court upheld the denial. The court found that California could exercise personal jurisdiction, reasoning that by dispatching his daughter from New York in order that she could live with her mother Mr. Kulko had caused an "effect" in California and had "purposely availed himself of the full protection and benefit of California laws." (*Kulko* v. *Superior Court, supra,* 19 Cal.3d 514 at p. 524.)

The United States Supreme Court found this logic unpersuasive and reversed. After establishing that California's assertion of jurisdiction was governed by the *International Shoe* standard, the court stated that "an essential criterion in all cases is whether the 'quality and nature' of the defendant's activity is such that it is 'reasonable' and 'fair' to require him to conduct his defense in that State. [¶] Like any standard that requires a determination of 'reasonableness,' the 'minimum contacts' test of *International Shoe* is not susceptible of mechanical application; rather, the facts of each case must be weighed to determine whether the requisite 'affiliating circumstances' are present." (*Kulko* v. *California Superior Court, supra,* 436 U.S. 84 at p. 92 [56 L.Ed.2d at p. 141].)

The *Kulko* court began its analysis by noting with approval that the California court had not relied on Mr. Kulko's "glancing presence in the State some 13 years before the events that led to this controversy" or the fact that he had permitted the children to visit his former wife in conformity with the terms of the separation agreement. (436 U.S. at pp. 92-93 [56 L.Ed.2d at pp. 141-142].) It then disagreed with the "purposeful availment" conclusion of the California court: "A father who agrees, in the interests of family harmony and his children's preferences, to allow them to spend more

time in California than was required under a separation agreement can hardly be said to have 'purposefully availed himself' of the 'benefits and protections' of California's laws." (*Id.* at p. 94 [56 L.Ed.2d at pp. 142-143].)

The court then turned to the question of whether this act of sending his daughter to California met the "effects" test derived from the American Law Institute's Restatement (2d) of Conflict of Laws, section 37 (1971). The section provides: "A state has power to exercise judicial jurisdiction over an individual who causes effects in the state by an act done elsewhere with respect to any cause of action arising from these effects unless the nature of the effects and of the individual's relationship to the state make the exercise of such jurisdiction unreasonable." Said the court: "As is apparent from the examples accompanying § 37 in the Restatement, this section was intended to reach wrongful activity outside of the State causing injury within the State . . . or commercial activity affecting state residents. . . . Even in such situations, moreover, the Restatement recognizes that there might be circumstances that would render 'unreasonable' the assertion of jurisdiction over the nonresident defendant." (436 U.S. at p. 96 [56 L.Ed.2d at p. 144].)[5]

California's assertion of jurisdiction failed this test of reasonableness. To begin with, "the instant action involves an agreement that was entered into with virtually no connection with the forum State." (436 U.S. at p. 97 [56 L.Ed.2d at p. 144].) Furthermore, "basic considerations of fairness point decisively in favor of appellant's State of domicile as the proper forum for adjudication of this case, whatever the merits of appellee's underlying claim. It is appellant who has remained in the State of the marital domicile, whereas it is appellee who has moved across the continent. . . . Appellant has at all times resided in New York State, and, until the separation and appellee's move to California, his entire family resided there as well. As

---

[5] In the apparent belief that *Kulko* did not absolutely preclude application of the "effects" within the context of domestic and family law, real party persuaded respondent court that her expulsion by petitioner caused the effect of her coming to California and seeking judicial redress in California. (See fn. 2, *ante.*) Whether the effects test retains validity in this area is an open question. The court in *Bartlett* v. *Superior Court* (1978) 86 Cal.App.3d 72, 76 [150 Cal.Rptr. 25], stated that "The *Kulko* opinion points out that this principle, applied in cases involving torts and commercial activities is not applicable to personal domestic relations." The contrary conclusion was apparently reached in *McGlothen* v. *Superior Court* (1981) 121 Cal.App.3d 106, 111-113 [175 Cal.Rptr. 129]. Other courts have accepted *Kulko* as casting doubt on whether the causation of effects within the forum state constitutes an independent basis for jurisdiction, yet still allowing it "to be a relevant factor to be evaluated with other considerations in applying the minimum contacts test." (*In re Marriage of Hattis* (1987) 196 Cal.App.3d 1162, 1174 [242 Cal.Rptr. 410]; see *In re Marriage of Lontos* (1979) 89 Cal.App.3d 61, 71 [152 Cal.Rptr. 271].) In light of our conclusion that jurisdiction can properly be asserted without reference to any "effects" in California caused by petitioner, we need not express an opinion on this matter.

noted above, appellant did no more than acquiesce in the stated preference of one of his children to live with her mother in California. This single act is surely not one that a reasonable parent would expect to result in the substantial financial burden and personal strain of litigating a child-support suit in a forum 3,000 miles away, and we therefore see no basis on which it can be said that appellant could reasonably have anticipated being 'haled before a [California] court,' . . . . To make jurisdiction in a case such as this turn on whether appellant bought his daughter her ticket or instead unsuccessfully sought to prevent her departure would impose an unreasonable burden on family relations, and one wholly unjustified by the 'quality and nature' of appellant's activities in or relating to the State of California." (*Id.* at pp. 97-98 [56 L.Ed.2d at pp. 144-145] [citations and fn. omitted].)

*Kulko* is of course relevant insofar as it establishes *International Shoe* as our guiding light in determining whether California may constitutionally exercise personal jurisdiction over petitioner. Yet the distinguishments of petitioner's situation possess such qualitative and quantitative importance that *Kulko* cannot be regarded as dispositive.

Unlike *Kulko,* the person who is resisting California's jurisdiction is the person who initiated the family's departures from the state of the marital domicile. There is no other state in the union where jurisdiction may be more appropriate. The action commenced by real party does not involve a written instrument. No issue is presented concerning support payments for minor children, and the couple's adult children have only tangential relevance.

Unlike Mr. Kulko, petitioner had much more than a "glancing presence" in California. He voluntarily moved here with real party. They underwent a marriage ceremony in California. Petitioner secured employment within this state. Petitioner thereafter departed for Pennsylvania to continue his education, but he left real party behind to live and work in California. Upon his return to California, petitioner again secured employment within the state and became a naturalized citizen. The birth of his daughters and the purchase of a family home extended his domestic roots within California. Between his return from Pennsylvania and his departure for Libya in 1967 to commence employment with Oasis, petitioner spent six uninterrupted years of married life in California. It may be inferred from the "repatriation leave" practice of Oasis that petitioner still treated California as the site of his permanent residence. Between 1967 and 1974, petitioner returned to California with his family on three such leaves, as well as the 1974 vacation. When petitioner's employment with Oasis terminated in 1974, it was again to California that he and his family returned with "all of our belongings." Upon their return, the couple purchased the Palmdale property. It was in

California that petitioner was hired by Aramco. As he did with Oasis, petitioner twice took his Aramco "repatriation vacations" from Saudi Arabia to California and twice provided passage for real party to return to California.[6] Aramco's records show that petitioner still claims Fullerton as his "permanent place of residence," despite the fact that the family home in that city was sold in 1977. Petitioner's dealings with the Department of Motor Vehicles shows him listing an address in California as well as one in Saudi Arabia.

These matters demonstrate that petitioner intentionally established numerous contacts with California. His diverse links with the state run the gamut from the personal to the professional to the commercial. Petitioner's deliberate connections and activities qualify as " 'extensive [and] wide-ranging' " (*Cornelison* v. *Chaney* (1976) 16 Cal.3d 143, 147 [127 Cal.Rptr. 352, 545 P.2d 264] [citing and quoting *Buckeye Boiler Co.* v. *Superior Court* (1969) 71 Cal.2d 893, 898-899 (80 Cal.Rptr. 113, 458 P.2d 57)] as well as " 'substantial . . . continuous and systematic.' " (*Id.* [citing and quoting *Perkins* v. *Benguet Mining Co.* (1952) 342 U.S. 437, 447-448 (96 L.Ed. 485, 493-494, 72 S.Ct. 413)].) Petitioner's ties evidence "act[s] by which [he] purposefully avail[ed him]self of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." (*Hanson* v. *Denckla* (1958) 357 U.S. 235, 253 [2 L.Ed.2d 1283, 1298, 78 S.Ct. 1228]; see *Burger King Corp.* v. *Rudzewicz* (1985) 471 U.S. 462, 474-476 [85 L.Ed.2d 528, 541-543, 105 S.Ct. 2174].) To this very day, petitioner maintains certain minimal contacts with California.

There is also the matter of the Palmdale property and petitioner's bank account. These properties are located within California and are among the marital assets real party seeks to have divided. In *Shaffer* v. *Heitner* (1977) 433 U.S. 186 [53 L.Ed.2d 683, 97 S.Ct. 2569], the court held that although "the presence of property in a State may bear on the existence of jurisdiction by providing contacts among the forum State, the defendant, and the litigation," "the presence of the property alone would not support the State's jurisdiction." (*Id.* at pp. 207, 209 [53 L.Ed.2d at pp. 699-701].) The court has acknowledged, however, that "[t]he ownership of property in the State is a contact between the defendant and the forum, and it may suggest the presence of other ties." (*Rush* v. *Savchuk* (1980) 444 U.S. 320, 328 [62 L.Ed.2d 516, 525, 100 S.Ct. 571].) Petitioner's property—transactionally related as it is to the subject matter of real party's action—therefore qualifies as yet another contact. The suggestion of other contacts is confirmed

---

[6] Aramco's "Industrial Relations Manual" defines "repatriation vacation" as "An extended paid leave of absence granted to an *expatriate* employee at specified intervals to permit visits *home*." (Italics added.)

by petitioner's admission that, with respect to the Palmdale property, he "writ[es] checks for installment payments and tax payments each year," and by real party's proof that the property is managed by a California firm. In addition, "the defendant's claim to property located in the State would normally indicate that he expected to benefit from the State's protection of his interest." (*Shaffer* v. *Heitner, supra,* at pp. 207-208 [62 L.Ed.2d at p. 700] [fns. omitted].) A reasonable inference from this evidence is that the property was purchased by petitioner for investment and may be resold by him. This expectation reinforces the conclusion that petitioner has purposefully availed himself of the benefits and protections of California's laws and contemplates doing so again. Furthermore, California has "strong interests in assuring the marketability of property within its borders and in providing a procedure for peaceful resolution of disputes about the possession of that property would also support jurisdiction." (*Id.* at p. 208 [62 L.Ed.2d at p. 700] [fn. omitted].)

The central concern in determining whether petitioner is subject to California jurisdiction is "the relationship among the defendant, the forum, and the litigation." (*Shaffer* v. *Heitner, supra,* 433 U.S. 186 at p. 204 [53 L.Ed.2d 683 at p. 698].) The preceding discussion establishes that, despite his lengthy absences from California, petitioner has consistently maintained tangible and intangible contacts with California. The nature and number of those contacts have fluctuated, but they remain ties that bind. Like a swallow, petitioner himself kept returning to California even when he lived halfway around the globe. To both of his overseas employers he has represented himself as being a permanent California resident. Petitioner's disintegrating marital relationship, religiously formalized in California, involves a partner who is presently living in California, and who (as real party put it in her declaration) is "unable to obtain employment within a period of time adequate to provide for my own support." It also involves the disposition of real and personal property situated within California. "In sum, California is the focal point both of the [marriage] and of the [economic consequences of its rupture]." (*Calder* v. *Jones* (1984) 465 U.S. 783, 789 [79 L.Ed.2d 804, 812, 104 S.Ct. 1482].) In light of these contacts and considerations, petitioner "could reasonably have anticipated being 'haled before a [California] court.'" (*Kulko* v. *California Superior Court, supra,* 436 U.S. 84 at pp. 97-98 [56 L.Ed.2d 132 at p. 145] [citing and quoting *Shaffer* v. *Heitner, supra,* 433 U.S. 186 at p. 216 (53 L.Ed.2d 683 at p. 705)].)

California is far from disinterested in these events. "California has a manifest interest in providing effective means of redress for its residents" (*McGee* v. *International Life Ins. Co.* (1957) 355 U.S. 220, 223 [2 L.Ed.2d 223, 226, 78 S.Ct. 199]), particularly respecting the property within its

borders. (*Shaffer* v. *Heitner, supra,* 433 U.S. 186 at p. 208 [53 L.Ed.2d 683 at p. 700].) California also has a substantial interest in the orderly resolution of a marital relationship commenced within her borders, particularly as that resolution would entail determining rights to property located in the state. It is likewise highly concerned with protecting the party to the dispute who is a resident. (See *Stuckey* v. *Stuckey* (1983 La.App.) 434 So.2d 513, 516; *Kennedy* v. *Kennedy* (1980) 10 Mass.App.113 [406 N.E.2d 409, 413]; *York* v. *York* (1985) 219 Neb. 883 [367 N.W.2d 133]; *Ifland* v. *Ifland* (1983) 120 Misc.2d 820 [467 N.Y.S.2d 27].)

As part of her initiation of this action, real party had the burden of establishing jurisdiction over petitioner by a preponderance of the evidence presented. (*Kroopf* v. *Guffey, supra,* 183 Cal.App.3d 1351 at p. 1356; *Messerschmidt Development Co.* v. *Crutcher Resources Corp.* (1978) 84 Cal.App.3d 819, 825 [149 Cal.Rptr. 35].) We hold that real party satisfied this burden, and that petitioner has failed to demonstrate that "maintenance of the suit . . . offend[s] 'traditional notions of fair play and substantial justice.' " (*International Shoe Co.* v. *Washington, supra,* 326 U.S. 310 at p. 316 [90 L.Ed. 95 at p. 102].)[7]

As previously mentioned, petitioner is also seeking to overturn the order directing him to pay spousal support, real party's attorneys' fees, and an advance against real party's share of the community property. His objection to that order is founded solely upon the supposed lack of personal jurisdiction. Given that the predicate for petitioner's objection is not sound, no further discussion of the order is needed.

The alternative writ of mandate is discharged and the petition for a peremptory writ is denied.

Anderson, P. J., and Channell, J., concurred.

A petition for a rehearing was denied October 25, 1988, and the opinion was modified to read as printed above. Petitioner's application for review by the Supreme Court was denied January 26, 1989.

---

[7] At our request, counsel for the parties briefed the possible application of the "national minimum contacts" theory expounded in Degnan and Kane, *The Exercise of Jurisdiction Over and Enforcement of Judgments Against Alien Defendants* (1988) 39 Hastings L.J. 799. We deeply appreciate counsel's thoughtful responses, which were in keeping with the extremely skillful and professional manner they have displayed throughout this proceeding. As our opinion indicates, this petition can be resolved by the traditional minimum contacts test. We consequently have no occasion either to examine or to adopt the alternative approach of Professors Degnan and Kane.