513 A.2d 874

**CAMELBACK SKI CORPORATION**

**v.**

**Ralph C. BEHNING et al.**

**No. 32, Sept. Term, 1985.**

Court of Appeals of Maryland.

Aug. 25, 1986.

Paul W. Grimm (Barrett W. Freedlander and Niles Barton & Wilmer, on the brief), Baltimore, and Stephen P. Kling (Crummey & Kling, on the brief), Annapolis, for appellant.

Philip O. Foard (Dennis F. O'Brien and White, Mindel, Clarke & Hill, on the brief), Towson, for appellee.

Argued before MURPHY, C.J., and SMITH[*], ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

---

[*] Smith, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

McAULIFFE, Judge.

We granted certiorari in this case to determine whether a Pennsylvania corporation operating a ski resort in that state had sufficient contacts with Maryland to justify this State's exercise of "long arm" personal jurisdiction over it in a tort action that neither arose out of nor was directly related to the activities of the foreign corporation within this State. We hold it did not.

Ralph Behning, a Maryland resident, suffered severe and permanent injuries in February, 1980, when he fell while skiing at Camelback, a ski resort owned and operated by Camelback Ski Corporation (Camelback) and located in the Poconos mountains of Pennsylvania. In October, 1982, Behning and his wife sued Camelback[1] in the Circuit Court for Baltimore County, claiming damages for alleged negligence of Camelback in the design, construction, maintenance, and "grooming" of one of its ski slopes, and in the failure to correct, or give adequate warning of, an unreasonably dangerous condition on the land. Camelback was served with original process in Pennsylvania, and following an unsuccessful attempt to remove the action to the United States District Court for the District of Maryland, Camelback filed a motion raising preliminary objection, seeking dismissal for lack of jurisdiction.[2] By its motion, Camelback contended it had not regularly done or solicited business in Maryland, nor engaged in any other persistent course of conduct here, nor had any substantial contacts with this State. Thus, it argued, personal jurisdiction could not properly be asserted under Maryland's long arm stat-

---

**1.** Appellees also sued Camelback Associates, Inc., a separate corporation that had developed and sold condominium units on land adjoining the ski resort. Judgment was entered in favor of that corporation pursuant to its motion for summary judgment, and no appeal was taken from that judgment.

**2.** The motion alternatively asked that service of process be quashed because of alleged procedural deficiencies. That issue was determined adversely to Appellant in the trial court, and has not been pursued on appeal.

ute, Maryland Code (1974, 1984 Repl.Vol., 1985 Cum.Supp.) §§ 6–101—6–103 of the Courts and Judicial Proceedings Article, or be consistent with the requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

The motion was considered by Judge James Sfekas on the pleadings, affidavits, discovery documents, and arguments of the parties. Judge Sfekas found the existence of certain contacts between Camelback and this State, and initially determined that these contacts were sufficient to support jurisdiction. Upon reconsideration, however, he was persuaded that the contacts, while sufficient to satisfy the statutory requirement for long arm jurisdiction, were "insufficient to satisfy the requirements of due process where the injury or tortious act occur[red] outside the state," and he dismissed the action. The Behnings appealed and the Court of Special Appeals reversed, holding that the contacts found by the trial judge were sufficient to satisfy the requirements of due process. *Behning v. Camelback Ski Corp.*, 61 Md.App. 11, 484 A.2d 646 (1984).

The parties agree that under the facts of this case the applicable portion of the long arm statute is § 6–103(b)(4), which provides:

(b) *In general.*—A court may exercise personal jurisdiction over a person, who directly or by an agent;

. . . .

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State[.]

Appellees' contention in this case is that Camelback "regularly does or solicits business ... in the state." They do not suggest that Camelback engages in any other persistent course of conduct in Maryland, and they concede that

Camelback does not derive revenue from anything used or consumed in this State.

This Court has consistently stated that the intent of the legislature in enacting Maryland's long arm statute was to expand the exercise of personal jurisdiction to the limits allowed by the Due Process Clause of the Fourteenth Amendment to the Federal Constitution. *Mohamed v. Michael*, 279 Md. 653, 657, 370 A.2d 551 (1977); *Geelhoed v. Jensen*, 277 Md. 220, 224, 352 A.2d 818 (1976); *Krashes v. White*, 275 Md. 549, 558–59, 341 A.2d 798 (1975); *Lamprecht v. Piper Aircraft Corp.*, 262 Md. 126, 130, 277 A.2d 272 (1971); *Harris v. Arlen Properties*, 256 Md. 185, 195–96, 260 A.2d 22 (1969); *Vitro Electronics v. Milgray*, 255 Md. 498, 504–05, 258 A.2d 749 (1969); *Gilliam v. Moog Industries*, 239 Md. 107, 111, 210 A.2d 390 (1965); *Marriott Corp. v. Village Realty & Inv.*, 58 Md.App. 145, 154, 472 A.2d 510 (1984). We have held that the legislative purpose in the enactment of the long arm statute was, to a great degree, "the expansion of judicial jurisdiction up to but not beyond the outermost limits permitted in this area by the due process decisions of the Supreme Court." *Lamprecht v. Piper Aircraft Corp., supra*, 262 Md. at 130, 277 A.2d 272.

The basic standard to be applied in determining whether this State may exercise personal jurisdiction over Camelback is whether that corporation has "certain minimum contacts with [Maryland] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). As the Supreme Court acknowledged in *Kulko v. California Superior Court*, 436 U.S. 84, 92, 98 S.Ct. 1690, 1696, 56 L.Ed.2d 132 (1978), this standard is not susceptible of mechanical application, and the facts of each case must be weighed to determine whether the requisite "affiliating circumstances" are present:

We recognize that this determination is one in which few answers will be written "in black and white. The

greys are dominant and even among them the shades are innumerable." *Kulko, supra,* 436 U.S. at 92, 98 S.Ct. at 1696 (citation omitted).

Following its decision in *International Shoe,* the Supreme Court, in a series of cases, further developed the standards applicable to a state court's exercise of personal jurisdiction. In *Perkins v. Benguet Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952), the Court considered the propriety of Ohio's exercise of jurisdiction over a Philippine mining corporation in a suit brought by a nonresident of Ohio. The corporation had been carrying on a continuous and systematic, but limited, part of its general business in Ohio. The president of the corporation was served with summons in Ohio while he was engaged in corporate business there. The cause of action sued upon did not arise in Ohio and did not relate to the corporation's activities there. The Court held that the Fourteenth Amendment left Ohio free to take or decline jurisdiction over the corporation. Despite the fact that the cause of action in *Perkins* was not related to the corporation's activities in Ohio, the Court noted that if a corporation carried on "continuous and systematic" corporate activities in a forum state, those activities would be sufficient to make it fair and reasonable to subject that corporation to proceedings *in personam* even though the cause of action was unrelated to the defendant's activities in that state. 342 U.S. at 445–49.

The Court further expanded the flexibility of the doctrine of personal jurisdiction in *McGee v. International Life Ins. Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). In *McGee,* the Court ruled unanimously that the issuance and delivery of a single life insurance policy by a Texas insurance company to a California resident (who paid the premiums by mail) gave the California courts the power to exercise jurisdiction in a beneficiary's suit for the policy proceeds. The Court noted that the trend of expanding the scope of state jurisdiction over foreign corporations and other nonresidents was "attributable to the fundamental transformation of our national economy over the years."

355 U.S. at 222, 78 S.Ct. at 200. Although the insurance company had never maintained an office or agent in California and there was no evidence to show that it had ever solicited or done any other insurance business in California, the Court stated that the elements of due process had been satisfied:

> It is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with that State. The contract was delivered in California, the premiums were mailed from there and the insured was a resident of that State when he died. It cannot be denied that California has a manifest interest in providing effective means of redress for its residents when their insurers refuse to pay claims. *Id.* at 223, 78 S.Ct. at 201 (citations omitted).

Despite a clear emphasis in *McGee* that personal jurisdiction could be upheld on the basis of very minimal contacts with the forum state, the Court, later in the same term, demonstrated that there were limits beyond which due process could not be stretched. In *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), the Court overturned Florida's exercise of jurisdiction over a Delaware bank. The complex fact situation in *Hanson* concerned a Pennsylvania resident who executed a trust instrument in Delaware, naming a Delaware bank as trustee. The Pennsylvania resident reserved a power of appointment over the remainder of the trust for herself and subsequently moved to Florida and purportedly exercised her power of appointment over the trust while in Florida. Upon her death the residuary legatees of the will brought suit in Florida for the rights to the remainder of the trust. A sharply divided Supreme Court reversed a Florida court's invalidation of the Delaware trust and its assertion of jurisdiction over the Delaware trustee, noting that the Delaware trustee did not have even those minimal contacts with Florida that were a prerequisite to a state's exercise of power over a party. Therefore, the Court concluded that jurisdiction over the trustee (an indispensable party to the action) had not been

obtained. While the Court in *Hanson* recognized the trend of expanding personal jurisdiction over nonresidents begun by the *International Shoe* case, it also emphasized a need for the exercise of restraint and said:

> [I]t is a mistake to assume that this trend heralds the eventual demise of all restrictions on the personal jurisdiction of state courts. Those restrictions are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States. However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the "minimal contacts" with that State that are a prerequisite to its exercise of power over him. 357 U.S. at 251, 78 S.Ct. at 1238 (citations omitted).

In applying the minimum contacts rule in *Hanson*, the Court noted that a defendant's contact with a forum state would vary with the quality and nature of the defendant's activity, and stated that:

> [I]t is essential in each case that there be some act by which the defendant *purposefully avails* itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws. 357 U.S. at 253, 78 S.Ct. at 1239 (emphasis added) (citations omitted).

Nearly twenty years passed before the Supreme Court again spoke in this area of the law. In *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), the Court held that assertions of *in rem* state-court jurisdiction must satisfy due process requirements in the same manner as assertions of *in personam* jurisdiction, and that the "central concern" must be on "the relationship among the defendant, the forum, and the litigation." 433 U.S. at 204, 97 S.Ct. at 2579.

Shortly thereafter, the Court considered *Kulko v. California Superior Court, supra,* and *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62

L.Ed.2d 490 (1980). In each case, the Court found the contacts between the defendant and the forum state to be insufficient to support the assumption of personal jurisdiction. In *World-Wide Volkswagen* the Court pointed out that the "minimum contacts" standard performs two related, but distinguishable functions. "It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to insure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *Id.* at 292, 100 S.Ct. at 564. Drawing from the earlier teachings of *Hanson v. Denckla, supra,* the Court said:

> Even if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment. *Id.* at 294, 100 S.Ct. at 565.

More recently, the Supreme Court has addressed the issue of long arm jurisdiction in four cases: *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984); *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984); *Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); and *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). In *Keeton,* New Hampshire's claim of personal jurisdiction over the publisher of *Hustler* magazine in a libel case was predicated upon a showing of sales activity within the state.[3] Noting that the contacts of Hustler Magazine, Inc. with New Hampshire were less than those shown to have

---

**3.** The evidence showed monthly sales of ten thousand to fifteen thousand copies of *Hustler* magazine within New Hampshire.

existed between the defendant corporation and the forum state in *Perkins v. Benguet Mining Co., supra*, and that Hustler's "activities in the forum may not be so substantial as to support jurisdiction over a cause of action unrelated to those activities," the Court nevertheless upheld jurisdiction because the cause of action arose out of the very activity that was being conducted, in part, in New Hampshire.

The concept of requiring more substantial contacts to support a claim of jurisdiction in a suit not arising out of or related to the defendant's contacts with the forum (general jurisdiction) than in a suit that does arise out of or is related to those contacts (specific jurisdiction) was not a novel one. In *Hanson v. Denckla, supra*, 357 U.S. at 251, 78 S.Ct. at 1238, the Court made a similar comparison:

> The cause of action in this case is not one that arises out of an act done or transaction consummated in the forum State. In that respect, it differs from *McGee v. International Life Ins. Co.* . . . and the cases there cited.

*See also* Brilmayer, *How Contacts Count: Due Process Limitations on State Court Jurisdiction*, 1980 Sup.Ct.Rev. 77, 80–88; and von Mehren & Trautman, *Jurisdiction to Adjudicate: A Suggested Analysis*, 79 Harv.L.Rev. 1136 (1966). The nature and importance of the distinction to be drawn between an assertion of general jurisdiction and an assertion of specific jurisdiction were more fully discussed by the Court in *Helicopteros Nacionales de Columbia, S.A., supra.* There, the Court made it clear that unlike the specific jurisdiction case of *McGee v. International Life Ins. Co., supra*, where a single transaction was sufficient to support jurisdiction, the required showing in general jurisdiction cases must be "the kind of continuous and systematic general business contacts the Court found to exist in *Perkins.*" 466 U.S. at 416, 104 S.Ct. at 1873. Professor James concluded that if "plaintiff's injury does not arise out of something done in the forum state, then other contacts between the corporation and the state must be *fairly extensive* before the burden of defending a suit there may be imposed upon it without offending 'traditional notions of

fair play and substantial justice.' " F. James, *Civil Proce-* *dure* 640 (1965) (emphasis added). The Restatement (Second) of Conflict of Laws (1971) incorporates this concept at § 47(2):

A state has power to exercise judicial jurisdiction over a foreign corporation which does business in the state with respect to causes of action that do not arise from the business done in the state if this business is so continuous and substantial as to make it reasonable for the state to exercise such jurisdiction.

■ We turn to a consideration of the particular facts of this case, and an evaluation of the contacts shown to have existed between Camelback and this State. Camelback is a Pennsylvania corporation with no charter or license to do business in Maryland, and no agent for service of process in this State. No bank accounts or telephone listings are maintained by Camelback in Maryland, and no taxes are paid to this State. Camelback sells no products here and derives its total income from its ski resort in Pennsylvania.

Camelback's primary marketing area consists of eastern Pennsylvania, the New York City metropolitan area, and northern New Jersey, and it is to this market that Camelback directs its advertising efforts. Camelback has not allocated or expended any of its funds for the purchase of advertising in Maryland.

On the other hand, Camelback has engaged in some solicitation of business within this State, and has provided information to publishers of trade magazines with knowledge that such information would be disseminated in Maryland. Additionally, Camelback has, on occasion and upon request, sent its brochures to ski shops within this State, and it maintains a toll-free telephone number which may be used by anyone in this State to obtain recorded information concerning ski conditions at the resort. It is the character, quality, consistency, and cause of these contacts that we must examine to determine whether they are sufficient, and

of such a continuous and systematic nature as will support the assertion of personal jurisdiction over Camelback.

We first consider the active solicitation of business within this State. The record discloses that Camelback is primarily a "day"[4] resort, although it does receive some "destination" business. Its primary market area is therefore comprised of those parts of Pennsylvania, New York and New Jersey lying within a 100 mile radius of the resort. On one occasion in 1982, in an effort to develop a secondary market, Camelback sent a sales representative into the Washington metropolitan area. This solicitation was for the purpose of developing mid-week business, and was apparently undertaken in cooperation with local hotels and motels. The sales representative visited travel agencies, and attempted to stimulate interest in the booking of mid-week "destination" business by offering a ten percent commission to the travel agents. Camelback's sales representative spent several days in Virginia, and in passing through Maryland visited ten or eleven travel agencies and one or two military installations. Having no current brochures, the representative secured the business card of any agent indicating an interest, and thereafter mailed current brochures to those agents. Camelback characterized this as an "exploratory trip" to determine the feasibility of expanding its market. It concluded that the venture was a "bomb" in terms of generating business for its ski resort from Maryland residents. No Maryland travel agents ever took advantage of the ski/stay package and the record indicates that no commission was ever paid to any travel agency in Maryland. Camelback asserts that the failure of this isolated trip to generate new business served to reinforce its long standing policy of restricting its solicitation efforts to its primary market area.

---

4. This term refers to the fact that a majority of the resort's clientele comes to the area for a day of skiing and then returns home. In contrast, a "destination" resort is one which attracts skiers for extended periods of time.

We are not persuaded that Camelback's sending of a representative to Maryland on a one day trip amounts to more than a contact of an isolated nature. It does not amount to the "regular" solicitation of business or to a "persistent course of conduct" in this State within the contemplation of § 6–103(b)(4), nor is it a contact of a "continuous and systematic" nature sufficient to satisfy the requirements of due process in a general jurisdiction case.

The trial judge also found that Camelback had contact with Maryland because of its "[d]issemination of information (to advertise) in national and regional publications." The evidence is uncontradicted that Camelback did not purchase advertising in publications intended for distribution in Maryland. Appellees did introduce evidence that information concerning Camelback had appeared in newspapers and magazines having a general circulation in Maryland, but there was no evidence that Camelback requested, paid for, or was even aware of the advertisements. To the contrary, the record showed that tour companies would offer package ski trips to a number of different resorts, and Camelback would be listed as one of the options. Camelback did offer a discount to any group of twenty or more persons, but it did not participate in the formation of the group or contribute in any way to the preparation or publication of the advertisements. Information concerning the facilities at Camelback would also appear from time to time in magazine and newspaper articles published in Maryland. Information for such articles could have been obtained as a result of a visit to the facility by the author, or by consulting a national publication that provides descriptive information concerning all major ski resorts, or by calling Camelback and requesting the information.

It appears that in finding a contact with Maryland through advertising efforts, the trial judge relied primarily

on Camelback's "listing"[5] in *Ski Resorts* magazine, a commercial publication intended for distribution in Washington, Baltimore, and vicinity. Camelback neither sought nor paid for this listing. An affidavit filed by the publisher of the magazine shows that the information was obtained, and the listing written, by magazine staff members at no charge to the ski resort. In the affidavit, the publisher stated that Camelback "has never purchased advertising of any kind in the Baltimore-Washington edition of 'Ski Resorts', despite . . . annual attempts to sell such space."[6]

The information for the listing in *Ski Resorts* magazine, although available from other sources, was in fact furnished by Camelback. The staff of the magazine sent a request for information, and this was completed and returned by Camelback.

We agree generally with the recent observations of the Fourth Circuit Court of Appeals that "[j]urisdiction may not be manufactured by the conduct of others," and "[t]he significant contacts considered are those actually generated by the defendant." *Chung v. Nana Development Corp.*, 783 F.2d 1124, 1127 (4th Cir.1986). However, we do not accept Camelback's suggestion that the listings must be disregarded entirely because they do not constitute paid advertisements. Camelback's direct participation in providing information to *Ski Resorts* magazine with knowledge that a listing would be published in a magazine enjoying general publication in this State constitutes a contact with this State, but under the circumstances we cannot characterize it as conduct by which "the defendant purposefully avail[ed] itself of the privilege of conducting activities within [this State], thus invoking the benefits and protections of

---

**5.** Such a "listing," as opposed to placing an advertisement, provides straight-forward factual information about a ski area such as trail layouts, rates, location and travel time.

**6.** The evidence did show that Camelback has purchased advertising in the Philadelphia edition of *Ski Resorts* magazine, a publication intended for distribution in Camelback's primary marketing area.

its laws." *Hanson v. Denckla, supra,* 357 U.S. at 253, 78 S.Ct. at 1239.

Judge Sfekas found as an additional contact the "maintenance of a toll free phone number for Maryland residents." The record discloses that Camelback maintained two toll-free telephone numbers for the purpose of providing reports of current ski conditions without charge to callers. However, the evidence is uncontroverted that Camelback did not set out to purchase a toll-free number for use by Maryland residents, but rather found that the purchase of the service for states within its primary marketing area automatically included service for Maryland, as well as other states outside that area. It is true that Camelback's brochures included the toll-free numbers, together with a listing of the states in which they could be used, including Maryland. However, as we shall discuss more fully *infra,* these brochures were not generally or systematically distributed in Maryland.

The fourth and final contact found to exist by Judge Sfekas was "the sending of information and brochures to Maryland residents and businesses." There is no evidence to support a finding that Camelback mailed brochures directly to residents of the State. The record does show that on request, Camelback would mail its brochures to any ski shop requesting them, and that in a given year it received five or six such requests from ski shops in Maryland. Mailings to Maryland ski shops were not automatically repeated on an annual basis, and were made only in response to a specific request. The only other distribution of Camelback's brochures within this State involved the ten or eleven follow-up mailings made by the sales representative following his unsuccessful attempt to solicit travel agency business in 1982.

Notwithstanding claims to the contrary by the Behnings, the jurisdiction they seek is general, and not specific. Their cause of action arose out of and is related to the alleged negligence of Camelback in the design, construction, and

maintenance of its ski slopes in Pennsylvania. Even assuming, without in any way intimating, that a case of specific jurisdiction could be made out by showing that the Behnings traveled to Camelback as a result of one of the few solicitations made by Camelback in this State,[7] there is no evidence to support that contention. Indeed, as the Court of Special Appeals noted, the Behnings conceded before that court that their trip to Camelback had not been triggered by Appellant's solicitation in Maryland. *Behning v. Camelback Ski Corporation*, 61 Md.App. 11, 20 n. 2, 484 A.2d 646 (1984).

While Camelback concededly has had contacts with the State of Maryland, we find those contacts, individually and collectively, insufficient to sustain a claim of general jurisdiction over that corporation. The contacts have been random, sporadic, and in some cases fortuitous. The contacts can hardly be described as of a "continuous and systematic" nature, nor does it appear that Camelback has *regularly* done or solicited business, or engaged in any other persistent course of conduct in this State. We are unable to find that by its conduct Camelback has purposefully availed itself of the privilege of conducting activities within this State and thereby invoked the benefit and protection of its laws, nor are we able to say that Camelback's conduct in connection with this State has been such that it should reasonably have "anticipate[d] being haled into court" here. *World-Wide Volkswagen Corp. v. Woodson, supra*, 444 U.S. at 297, 100 S.Ct. at 567.

---

**7.** It is clear that the cause of action did not arise out of any contact Camelback had with Maryland. We need not here address the question of whether the terms "arising out of" and "related to" have different meanings in this context. This question, and the related question of whether, if the terms do have different meanings, an assertion of jurisdiction based upon a cause of action related to but not arising out of a defendant's contacts should be analyzed as an assertion of specific jurisdiction, are questions specifically left open by the Supreme Court. *See Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 415 n. 10, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

The legitimate interest that this State has in providing a forum to one of its citizens, and the fact that the action could probably be litigated in this State without significant inconvenience to the Appellant, while factors worthy of serious consideration, cannot alone serve as the foundation for assumption of jurisdiction. *World-Wide Volkswagen Corp. v. Woodson, supra,* 444 U.S. at 294, 100 S.Ct. at 565; *Hanson v. Denckla, supra,* 357 U.S. at 251, 78 S.Ct. at 1238. The protections of the Due Process Clause require that this State decline Appellees' request to exercise jurisdiction over this cause of action.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY. RESPONDENTS TO PAY THE COSTS.