THAT the government's motion for summary judgment be, and the same, is hereby DENIED; and further

THAT the government's counterclaim is DISMISSED WITH PREJUDICE.

**POWER CONVERSION, INC.**

v.

**SAFT AMERICA, INC., et al.**

Civ. No. Y–87–80.

United States District Court,
D. Maryland.

Oct. 27, 1987.

John Sinclair, Baltimore, Md., for plaintiff.

David McI. Williams, Francis J. Gorman, and Thomas Hoxie, Baltimore, Md., for defendant Saft America, Inc.

G. Stewart Webb, Jr., and Jeffrey J. Peck, Baltimore, Md., for defendant TNR Technical, Inc.

Ronald M. Spritzer, Baltimore, Md., for defendant Robert Calvert.

## MEMORANDUM

JOSEPH H. YOUNG, District Judge.

Plaintiff Power Conversion, Inc. ("PCI") filed suit against its competitors Saft America, Inc. ("Saft") and TNR Technical, Inc. ("TNR") and individuals Robert Calvert and Richard Thaw alleging violations of the federal antitrust laws. Specifically, PCI alleges that defendants "and others conspired and agreed by, between and among each other to fix the amounts of the bids which Saft and TNR submitted in connection with certain solicitations by the U.S. Government for LiSO$_2$ battery production contracts, and did so in advance of submitting their bids to the U.S. Government." Complaint ¶ 17. Although plaintiff's claim is based upon Section 1 of the Sherman Act, 15 U.S.C. § 1, plaintiff's theory is that defendants "conspired and agreed to fix the prices submitted by Saft and TNR at unreasonably low prices, or

which Saft, TNR, Calvert, and Thaw knew or reasonably should have known that Saft and/or TNR could not earn a reasonable profit or rate of return." Complaint ¶ 19. Plaintiff claims that this alleged conspiracy "has caused injury to PCI and has had anti-competitive effect on the market for the U.S. Government's LiSO$_2$ battery production contracts and procurement program." Complaint ¶ 21.

Defendants Saft and TNR have moved to dismiss the complaint for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6). Defendant Calvert joins that motion and also moves to dismiss for lack of personal jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(2). Since filing this case, PCI and Saft have resolved their differences by a stipulation of dismissal leaving open PCI's claims against TNR and the individual defendants. The Court's doubts concerning the nature of plaintiff's injury as compensable under the antitrust laws shall await resolution upon more adequate briefing of these issues before trial.

## PLAINTIFF'S SECTION 1 CLAIM

Plaintiff's claim arises out of a series of contract biddings solicited by the U.S. Army for batteries of LiSO$_2$ electric power storage cells. Plaintiff's other claims relating to patents and trade secrets are the subject of actions consolidated in civil action Y–85–4455, which is proceeding separately in this Court. The antitrust claim at issue here is based upon direct evidence of a conspiracy to underbid PCI on the small business set-aside which applied to several of the solicitations. The affidavit of Anthony Vigliotti, president of defendant TNR during the submission of contract bids, states that defendants Calvert and Thaw, then key employees of Saft and TNR, respectively, admitted to Vigliotti that Saft and TNR had "agreed in advance upon the prices which TNR and Saft would submit as bids to the Government for the [H–307] contract.... Therefore, to avoid the appearance of collusion, they determined that Saft and TNR would submit bids that were close in amount, but TNR's bid would be slightly higher than Saft's bid." Vigliotti

affidavit at 6–7. From the vice-president of Saft, Vigliotti learned that the "agreement concerning prices to be submitted by Saft and TNR for that bid had been necessary so that they could break into the $LiSO_2$ battery market." *Id.* at 9.

Plaintiff alleges that defendant's "conspiracy" was intended to take advantage of the small business set-aside program of the Small Business Administration ("SBA"). Certain of the battery contract solicitations on which Saft, TNR, and PCI bid in 1983, allowed for small business set-asides of fifty percent. Chodosh affidavit (Adams Decl.Exh.L). This set-aside allows the lowest bidding "small business" the option of obtaining a separate contract for half of the production solicited, in the event that a "large business" underbids the lowest small business bid. Complaint ¶ 9, Vigliotti's affidavit pertains to contract solicitation # DAAB07–83–B–H307, but plaintiff alleges that the conspiracy involved bidding on similar solicitations—H306, H320, and H360, which were $LiSO_2$ battery contracts bid upon in 1983. Chodosh affidavit; PCI's response at 13. *See* Adams Decl.Exh. 6.

■ Defendants Saft, TNR, and Calvert have moved to dismiss PCI's antitrust claims with respect to solicitation H320, because PCI received the contract, and as to solicitation H306 because no small business set-aside was awarded. Defendant's claim that PCI had a full and fair opportunity to litigate claims of bid-rigging as to H307 in the SBA's size protest and appeal proceedings, and that PCI never protested the contract award in H360. *See* Saft's memorandum, Saft's reply, TNR's motion, and Calvert's memorandum. None of these arguments are persuasive because they misconstrue the nature and import of plaintiff's antitrust claim, which is not the focus of the SBA's size determination process. The argument that the SBA Administrative Law Judge's cursory treatment of conspiracy issues should collaterally estop plaintiff's price-fixing claim regarding solicitation H307 is easily rejected. However defendants' allegedly fraudulent size classification strategy may have been examined in the SBA proceedings, it is not at issue here, nor was the issue "finally decided" by the SBA *res judicata* with regard to antitrust issues properly presented here.[1] Similarly, the argument that any antitrust claim based upon solicitation H360 is barred by plaintiff's failure to utilize the SBA's protest and appeal process is unfounded.

■ Defendants' attempt to separate plaintiff's unified claim of price-fixing into "counts" pertaining to individual contract bids also is unpersuasive. Plaintiff has alleged "price-fixing ... including, but not limited to solicitations Nos. 83–B–H307, 83–B–H306, and 83–B–H320." Complaint ¶ 17. Defendants' allegations that contract H320 was awarded to PCI and that H306 was awarded without a small business set-aside do not strip PCI of standing to sue under Section 4 of the Clayton Act because PCI's theory envisions a pattern of agreed-upon actions constituting price-fixing. In supplemental pleadings, PCI has explained that the alleged conspiracy included an "attempt to fix certain of their prices in such a way as to as to [sic] insure that Saft and TNR would *not* win certain contracts, and thereby enable defendants to create circumstantial evidence for a 'plausible denial' of the fact that there had been price-fixing on some of the contracts." PCI's supplemental memorandum at 2–3. Thus, plaintiff has described a theory of conspiracy, plausibly based upon facts in Vigliotti's affidavit, which does state a claim under the antitrust laws ripe for resolution in federal court.

1. Administrative Judge Riotti's April 18, 1983 decision addressed PCI's claim that "TNR was set up by Saft, [a large business], to act as a 'front' for the purpose of supplying Saft batteries under the pretext that they were manufactured by TNR." The decision was limited to small business qualification issues under 15 U.S.C. § 632. *See* Adams's Decl. Exh. I. Plaintiff's present claim is that these same actions constitute antitrust violations and the SBA's size determination is not controlling, because private antitrust claims are brought in federal district court pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15; 28 U.S.C. § 1337(a), not in the SBA. Thus, PCI's claims that the SBA's proceedings did not provide a "full and fair opportunity to litigate" need not be addressed.

Defendants argue that plaintiff's theory of price-fixing for the purpose of predatory pricing no longer is actionable under the antitrust laws, in light of the decision in *Matsushita Electrical Industrial Company, Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). They also argue that "below cost bids on government contracts cannot possibly establish a monopoly" and that when predatory pricing allegations are implausible they should not be allowed to go to trial. Saft's reply at 8, 10. This argument misconstrues *Matsushita* and focusses on the plaintiff's inclusion of a predatory pricing rationale to explain defendants' conspiracy—an element which is extraneous to the proof of a violation of Section 1 of the Sherman Act.

■ Price-fixing is *per se* illegal regardless of whether the objective is to raise or lower market prices, whether the agreement is successful or not, and whether the prices were reasonable or not. *United States v. Socony-Vacuum Oil Co., Inc.*, 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940). "Even though members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interferring with the free play of market forces." *Id.* at 221, 60 S.Ct. at 843. The *per se* rule applies to "agreements to raise or lower prices whatever machinery for price-fixing was used." *Id.* at 222, 60 S.Ct. at 843. It condemns them "whether the concerted activity be wholly nascent or abortive on the one hand, or successful on the other." *Id.* n. 59 at 225, 60 S.Ct. n. 59 at 845.

Bid-rigging practices in particular have been found to violate Section 1's prohibition on restraints of trade, whether the agreement was to submit higher or lower bids. *United States v. Brinkley & Son Construction Co.*, 783 F.2d 1157, 1161 (4th Cir.1986); 2 Von Kalinowski, Antitrust Laws and Trade Regulation § 6A.02[3] (1987) (agreements to make fictitious or fraudulent bids). Thus, plaintiff's theory that defendants fixed prices in order to predate their competitor PCI, is unneces-

sary: proof of agreement to fix prices in a relevant "market" is sufficient. Plaintiff has stated an antitrust claim actionable in federal court.

The Supreme Court's decision in *Matsushita* cannot be regarded as holding that "judges should not allow implausible predatory pricing allegations to go to trial." *Matsushita* addressed the standard for granting summary judgment when the plaintiff has presented only circumstantial evidence of conspiracy. In *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984), the Court had held that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of conspiracy." *Matsushita*, 106 S.Ct. at 1357. In *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), the Court had held that the plaintiff must, in order to survive a motion for summary judgment on a Section 1 claim, "present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita*, 106 S.Ct. at 1357, *quoting Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1470. The Court in *Matsushita* found that "if the factual context renders [plaintiff's] claim implausible—if the claim is one that makes no economic sense—[plaintiffs] must come forward with more persuasive evidence to support their claim than would otherwise be necessary." 106 S.Ct. at 1356. Where the "evidence of conspiracy is speculative or ambiguous" the district court may grant summary judgment against plaintiff. 106 S.Ct. at 1360. Thus, the Court held that if plaintiffs "had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." 106 S.Ct. at 1361.

■ Plaintiff PCI does not offer circumstantial evidence to support an inference that a conspiracy occurred, as was the case in *Matsushita, Monsanto,* and *Cities Service.* Rather, plaintiff offers the testimony of TNR's former president that defendants

Calvert and Thaw and others informed him of the existence and operational details of the "conspiracy," in addition to other circumstantial evidence of concerted predatory pricing. Predatory pricing is still considered a practice "inimical to the purposes of [the antitrust] laws."[2] *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *Cargill v. Monfort of Colorado, Inc.*, —— U.S. ——, 107 S.Ct. 484, 493, 93 L.Ed.2d 427 (1986). Concerted actions to fix prices are still *per se* illegal.[3] *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 351, 102 S.Ct. 2466, 2476, 73 L.Ed.2d 48 (1983). Defendants' argument confuses the caselaw concerning inferences of conspiracy from circumstantial evidence with the facts alleged in this case that defendants admitted a conspiracy to rig bids. Plaintiff has raised a genuine issue of material fact for trial supporting its claim of illegal price fixing. Unlike the "direct evidence" relied upon in error by the Court of Appeals in *Matsushita*, the evidence offered here relates directly to the agreement alleged to have injured plaintiff.

*See Matsushita*, 106 S.Ct. at 1361. Defendants have not attempted to characterize the alleged conspiracy as an output-enhancing joint venture. *See, e.g., NCAA v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). Thus, plaintiff PCI has stated a claim upon which relief may be granted, and defendants' motion to dismiss is denied.[4]

## PERSONAL JURISDICTION

■ Defendant Calvert has also moved to dismiss plaintiff's complaint for lack of personal jurisdiction pursuant to Fed.R. Civ.P. 12(b)(2). A brief discussion will explain the Court's denial of Calvert's motion. Robert Calvert resided in Maryland and was employed here as director of marketing for defendant Saft from 1983 until January, 1985, when he became president of defendant TNR Technical, Inc. in New York. Since January, 1985, Calvert has visited Maryland on behalf of TNR and Altus Corp., his employer in California since 1986. *See* Calvert affidavit. Calvert

---

**2.** Although the Court in *Matsushita* did examine the economic theory of predatory pricing behavior and conclude that a "predatory pricing conspiracy is by nature speculative," 106 S.Ct. at 1357, it did not rule that they are legal. "The Court of Appeals found that [plaintiffs'] allegation of a horizontal conspiracy to engage in predatory pricing, if proved, would be a *per se* violation of § 1 of the Sherman Act. [*In Re Japanese Electronic Products* ] 723 F.2d [238] at 306 [3rd Cir.1983]. [Plaintiffs] did not appeal from that conclusion." 106 S.Ct. at 1355. *Matsushita* cannot be read to support Saft's proposition that conspiracies to engage in predatory pricing must be dismissed due to economic irrationality regardless of direct evidence of such conduct.

**3.** Not all conduct affecting price competition has been considered *per se* illegal. Joint ventures and cooperative arrangements which are "price-fixing" only in the literal sense may be reviewed under the "Rule of Reason" analysis. *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 9, 19–23, 99 S.Ct. 1551, 1556, 1562–64, 60 L.Ed.2d 1 (1979) (blanket license arrangement characterized as being not facially output-reducing but rather aiding economic efficiency); *NCAA v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 100, 104 S.Ct. 2948, 2959, 82 L.Ed.2d 70 (1984) (joint selling arrangement may be pro-competitive

and thus analyzed under Rule of Reason); *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918) (only "unreasonable" restraints are illegal under Sherman Act).

Here, defendant Saft has not argued that the alleged conspiracy was pro-competitive because of special characteristics of the battery industry. Indeed, defendants' actions were secretive, unlike the openly acknowledged behavior found to enhance competition in the cases cited above.

**4.** The Court is nevertheless troubled by plaintiff's theory of injury and has not addressed this issue because defendants did not raise the issue in their motions to dismiss, and the issue was inadequately discussed by both Saft and PCI in their later pleadings. Plaintiff claims that it has been "injured by being required to compete with Saft and TNR at these unreasonably low prices." PCI's response at 22; Complaint ¶ 14. Hopefully plaintiff will develop and explain its theory of antitrust injury in accordance with governing caselaw as the case progresses. *See, e.g., Brunswick v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). Further, the standard of what constitutes a "predatory price" is unclear, *Cargill, supra*, 107 S.Ct. at 493, and may be difficult to prove adequately for damages measurement purposes.

asserts that any meetings which are the focus of plaintiff's charges of price-fixing occurred in New York or New Jersey, and that Calvert's contacts with Maryland as corporate representative after January, 1985, are not contacts recognized as supporting personal jurisdiction. *See* Calvert's reply at 4, 6. Additionally, Calvert argues that because the contracts allegedly rigged were designated in plaintiff's complaint as "for sale to the U.S. Government and, in particular, to the U.S. Army at Ft. Monmouth, NJ" (Complaint ¶ 7), other contacts with Maryland are unimportant. Calvert's reply at 9. Furthermore, Calvert locates the price-fixing "injury" at plaintiff's production facilities in New Jersey. *Id.* at 3, 17. These assertions will be taken as true for purposes of resolving Calvert's motion, although many of Calvert's characterizations of his business contacts surrounding the alleged bid-rigging are in dispute. *See* PCI's answer and its supplemental memorandum. The Court finds that personal jurisdiction is evident without an examination of the disputed facts.

Maryland's "long-arm" statute, *Maryland Courts and Judicial Code Annotated,* § 6–103, provides in relevant part as follows:

CAUSE OF ACTION ARISING FROM CONDUCT IN STATE OR TORTIOUS INJURY OUTSIDE STATE.

(a) *Condition.*—If jurisdiction over a person is based solely upon this section, he may be sued only on a cause of action arising from any act enumerated in this section.

(b) *In general.*—A court may exercise personal jurisdiction over a person who directly or by an agent:

(1) Transacts any business or performs any character of work or service in the State;

. . . . .

(3) Causes tortious injury in the State by an act or omission in the State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State. . . .

Upon the facts admitted in Calvert's own affidavit, jurisdiction exists under § 6–103(b)(1) or (b)(4). Information obtained from discovery may support jurisdiction under § 6–103(b)(3).

Calvert resided in Maryland and managed Saft's marketing program during the same period in which the alleged price-fixing occurred. "The taking up of residence is, in fact, the quintessential act by which one avails himself of the privilege of conducting activities in the state." *Geelhoed v. Jensen,* 277 Md. 220, 231, 352 A.2d 818 (1976). The fact that plaintiff left Maryland in January, 1985, is "not, however, dispositive, since here [defendant] was a resident of the State at the time of the cause of action arose ... though it occurred [elsewhere], bore a substantial relationship to the State." *Id.* at 233, 352 A.2d 818; *Behning v. Camelback Ski Corp.,* 61 Md.App. 11, 17, 484 A.2d 646 (1984), *rev'd on other grounds,* 307 Md. 270, 513 A.2d 874 (1986). Thus, Maryland's long-arm statute § 6–103(b)(4) extends jurisdiction to persons whose acts, performed out-of-state during a period when they were Maryland residents, caused injury in or outside Maryland.[5] Thus, Calvert's argument that both plaintiff's "injury" and defendant's alleged "acts" constituting price-fixing occurred outside Maryland are irrelevant to jurisdiction under Maryland law.[6]

---

**5.** Even without Calvert's residence during the relevant period of alleged illegal activities, jurisdiction under § 6–103(b)(1) would exist if *any* of the transactions in Maryland could support a cause of action for price-fixing. *See In Re Mid-Atlantic Toyota Antitrust Litigation,* 525 F.Supp. 1265, 1270 (D.Md.1981) (preparatory meetings were "an integral part of the price-fixing conspiracy)."

**6.** Calvert also claims benefit of the "fiduciary shield" doctrine that "[c]ontacts as a corporate representative on corporate business do not give rise to personal jurisdiction over the individuals." Calvert's reply at 4, *quoting Quinn v. Bowmar Publishing Co.,* 445 F.Supp. 780, 786 (D.Md. 1978). However, such protection is inappropriate where the defendant is charged as being a conspirator in price-fixing. "The 'fiduciary

Maryland's long-arm statute was intended to "expand the exercise of personal jurisdiction to the limits allowed by the Due Process Clause of the Fourteenth Amendment to the Federal Constitution." *Camelback Ski Corp. v. Behning*, 307 Md. 270, 274, 513 A.2d 874 (1986); *Geelhoed v. Jensen, supra*, 277 Md. at 224, 352 A.2d 818. Due process analysis, of course, is the province of federal caselaw. The keynote of due process limits to state exercise of personal jurisdiction is that there must be "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Defendant rests his due process argument on the inconvenience of his submitting to the litigation in this Court: "it is neither reasonable nor fair to require Calvert to defend himself in Maryland more than two years after he left the state and after he was moved to the other side of the country." Calvert's reply at 12. The Court, however, finds that Maryland is no more "inconvenient" for Calvert, now living in California, than would be New Jersey, which Calvert claims is the state of most relevant contacts. In view of facts asserted by plaintiff in its answer, not controverted by Calvert, there is no absence of minimum contacts in Maryland. Substantial contacts include delivery of most of Saft's goods to the U.S. Army FOB Baltimore, the Army's administration of contracts and inspection of goods in Maryland, and, most importantly, Saft's maintenance of offices in Maryland for its director of marketing, defendant Calvert. Indeed, the plaintiff's cause of action arises out of the defendant's marketing activities themselves. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 779–80, 104 S.Ct. 1473, 1480–81, 79 L.Ed.2d 790 (1984). Thus, it is not unreasonable or unfair for this Court to take jurisdiction over Calvert, notwithstanding the two years of non-residency in this state.

shield' does not apply where a corporate officer has allegedly committed a personal or business tort within the state." *In Re Mid-Atlantic Toyota Antitrust Litigation, supra*, 525 F.Supp. at 1270–

## ORDER

In accordance with the attached Memorandum, it is this 27th day of October, 1987, by the United States District Court for the District of Maryland, ORDERED:

1. That defendants' motion to dismiss for failure of plaintiff to state a claim, or in the alternative, for summary judgment BE, and the same IS, hereby DENIED;

2. That defendant Calvert's motion to dismiss for lack of personal jurisdiction BE, and the same IS, hereby DENIED; and

3. That a copy of this Memorandum and Order be mailed to the parties.

71. Furthermore, the fiduciary shield is irrelevant to the period before January, 1985, when Calvert resided in Maryland and managed Saft's sales program.