594 A.2d 115
**Deborah L. TAYLOR**
**v.**
**Linwood M. HEAD.**
**No. 137 Sept. Term, 1990.**
Court of Appeals of Maryland.
Aug. 23, 1991.

Mercedes C. Samborsky, Joppatowne, for appellant.

John C. Love (Margaret A. Attanasio, both on brief) Bel Air, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW and KARWACKI, JJ.

KARWACKI, Judge.

In this case we are concerned with whether a North Carolina trial court was vested with personal jurisdiction over Linwood M. Head, a Maryland resident, when it entered an order on October 14, 1987, requiring him to contribute to the support of his minor child, who resided in North Carolina with his mother, Deborah L. Taylor, and, if so, whether its exercise of personal jurisdiction under the circumstances of this case was consistent with the limitations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

I.

Deborah L. Taylor and Linwood M. Head were married in Bel Air, Maryland, on May 4, 1963, and lived in this state until 1976 when the couple and their two sons moved to North Carolina. The younger son, Christopher, born on January 10, 1972, is the subject of the North Carolina child support order in issue in this case. The couple separated on September 3, 1980, and entered into a separation agreement on November 7, 1980, in North Carolina. Thereafter, Head returned to Maryland where he has since resided.

In the separation agreement the parties agreed that the wife should have custody of their minor children, Michael who was then 12 years old, and Christopher. The husband was given reasonable visitation rights with his children. Mr. Head agreed to pay $225 per month for the support of the children. Additionally, he agreed to maintain medical insurance covering them and to be responsible for a share of their medical and dental expenses not covered by insurance. Also, Head agreed that his wife and children could occupy the marital home of the parties in Eden, North Carolina, until the youngest of their children reached 18 years old. Finally, he agreed to make the mortgage payments due on that dwelling.

On September 16, 1981, the wife filed a complaint in the District Court Division of the General Court of Justice in

Rockingham County, North Carolina (the trial court), seeking an absolute divorce from Head. Apparently satisfied with the agreement she had made with her husband for the custody of their children and his contribution to their support, she did not ask for court ordered custody or support. Head executed a Certificate of Acceptance of Service of the complaint his wife had filed against him. That certificate was executed by him in Maryland on October 13, 1981 and filed in the North Carolina trial court on October 22, 1981. On October 13, 1981, Head also executed in Maryland an agreement modifying the separation agreement which he and his ex-wife had entered earlier. The modifications dealt with Head's responsibility for the medical and dental expenses of his children, his duty to maintain certain policies of life insurance, and the allocation of income tax exemptions for the children between Head and his ex-wife. The trial court entered its judgment absolutely divorcing the parties on November 18, 1981.

Head contributed to the support of his children, who were in the custody of his ex-wife in North Carolina, until June 24, 1984, when the parties entered a supplemental separation agreement. In that supplemental agreement they agreed that Head would have custody of their children with reasonable visitation reserved to their mother. Further, since Head's ex-wife was then contemplating remarriage, they provided that their former marital home would be sold and the net proceeds of that sale divided between them. Head traveled to North Carolina to execute the supplemental agreement and then returned to Maryland. He returned to North Carolina in July of 1984 to take custody of his children and again in December of 1984 to attend the settlement on the sale of his former marital home.

Thereafter, Head's two sons lived with him in Maryland. The older son, Michael, reached his majority in 1986.

Because irreconcilable conflicts developed between Christopher and his father, Head ordered Christopher to leave his household on July 7, 1987. Christopher, then 15 years of age, returned to his mother's home in North Carolina and

has since resided there. After his return, the former Mrs. Head, Deborah L. Taylor, requested a contribution for Christopher's support from Head who refused to make any payment.

Taylor then returned to the trial court and filed a Motion for Custody and Child Support in the action in which her divorce had been granted in 1981. The motion attached and incorporated by reference the Separation Agreement of November 7, 1980, the Modification Agreement signed by Head on October 13, 1981, and the Supplemental Agreement of June 24, 1984. A copy of that motion was delivered to Head by certified mail on August 19, 1987. A notice setting the motion for a hearing before the court on October 5, 1987, was delivered to Head by certified mail on August 26, 1987. Head filed no answer to the motion and did not appear at the hearing.

After hearing testimony from Taylor and Christopher, the trial court entered an order on October 14, 1987, granting custody of Christopher to Taylor and ordering Head to contribute $518.00 per month for the support of Christopher until he reached 18 years of age, the age of majority. Head has made no support payments in compliance with that order.

On March 30, 1989, Taylor caused the North Carolina trial court's order of October 14, 1987, to be recorded among the records of the clerk of the Circuit Court for Harford County pursuant to Maryland Code (1984, 1990 Cum.Supp.) §§ 10–332 through 10–340 of the Family Law Article. On April 7, 1989, in response to a motion filed by Taylor, the circuit court issued an earnings withholding order directed to Head's employer in accordance with §§ 10–120 through 10–135 of the Family Law Article. Head timely moved for a stay of that earnings withholding order pursuant to § 10–130 of the Family Law Article, asserting that when the North Carolina trial court entered its order requiring him to contribute to the support of his minor son, Head was not subject to the personal jurisdiction of that court.

After a hearing, the circuit court granted Head's motion to stay the earnings withholding order. Taylor appealed that judgment to the Court of Special Appeals. On our own motion, we issued a writ of certiorari prior to the case being considered by the intermediate appellate court.

## II.

An action to compel child support is one *in personam*, requiring the court to obtain personal jurisdiction over the obligor in order to render a valid judgment ordering payment of support. North Carolina General Statutes § 50–13.5; *Johnson v. Johnson*, 14 N.C.App. 378, 188 S.E.2d 711 (1972). North Carolina's long arm statute permits the court to acquire jurisdiction over a non-resident defendant under the following circumstance:

"Local Services, Goods or Contracts.—In any action which:

c. Arises out of a promise, made anywhere to the plaintiff or to some third party for the plaintiff's benefit, by the defendant to deliver or receive within this State, or to ship from this State goods, documents of title, or other things of value;" N.C.G.S. § 1–75.4(5).[1]

North Carolina's long arm statute has been consistently interpreted as a legislative attempt to assert *in personam* jurisdiction over non-resident defendants to the full extent permitted by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Dillon v. Numismatic Funding Corp.*, 291 N.C. 674, 231 S.E.2d 629, 630 (1977); *Kaplan School Supply v. Henry Wurst, Inc.*,

---

**1.** N.C.G.S. § 1–75.4 was amended by Session Laws 1981, c. 815 which added subdivision (12) providing:
"Marital Relationship.—In any action under Chapter 50 that arises out of the marital relationship within this State, notwithstanding subsequent departure from the State, if the other party to the marital relationship continues to reside in this State."
That amendment, however, was expressly made inapplicable to marital relationships which were terminated by an action for absolute divorce filed before October 1, 1981. *Schofield v. Schofield*, 78 N.C.App. 657, 338 S.E.2d 132, 134 (1986).

56 N.C.App. 567, 289 S.E.2d 607 (1982), *cert. denied,* 306 N.C. 385, 294 S.E.2d 209 (1982). For this reason, the statute has been liberally construed in favor of finding personal jurisdiction, subject to due process limitations. *Phoenix America Corp. v. Brissey,* 46 N.C.App. 527, 265 S.E.2d 476, 478 (1980).

North Carolina General Statutes § 1–75.4(5) has been interpreted to authorize the court to acquire personal jurisdiction over a non-resident in an action to enforce promises he made in a separation agreement entered within the state. *Pope v. Pope,* 38 N.C.App. 328, 248 S.E.2d 260 (1978). The *Pope* court reasoned that a separation agreement entered in North Carolina was a "local contract" and the support payments promised therein a "thing of value" which were sent into North Carolina by the obligor. *Cf. Van Wagenberg v. Van Wagenberg,* 241 Md. 154, 215 A.2d 812 (1966), *cert. denied,* 385 U.S. 833, 87 S.Ct. 73, 17 L.Ed.2d 68 (1966), where we held that a New York judgment recovered in a suit against a Maryland resident, based upon a separation agreement he executed in New York, was entitled to full faith and credit where the Maryland resident was subjected to the personal jurisdiction of the New York court under its long arm statute.

■ Head attempts to distinguish *Pope* from the circumstances present in the instant case. He points out that when Taylor instituted the divorce action in the North Carolina trial court in 1981, she made no effort to have that court assert personal jurisdiction over him, although he readily concedes that the separation agreement they executed in North Carolina in November of 1980, would have provided a basis for *in personam* jurisdiction to enforce his promises to support their children. He then argues that by the time Taylor sought to compel him to support Christopher in 1987, the supplemental agreement which the parties executed in June of 1984 had relieved him of any duty to furnish such support.

We disagree with Head's analysis of the circumstances. It is obvious that Taylor made no claim for child support in the divorce action in 1981 because she was relying on Head's continued performance of his promises to support the children which he made in the separation agreement in November of 1980, which was modified by the parties in October of 1981.

Furthermore, the supplemental agreement executed in June of 1984 should not be viewed in isolation from the earlier agreements dealing with Head's duty to support his children. It is manifest that the parties from 1980 forward had attempted to resolve Taylor's need for child support assistance and Head's duty to furnish such support by amicable means. It was only after Head attempted to avoid that responsibility in 1987 that judicial intervention became necessary. In entertaining Taylor's effort to compel Head to contribute to the support of Christopher in 1987, the North Carolina trial court properly viewed her action as one arising out of the promises Head made in the separation agreement in November of 1980, and the supplemental agreement they executed in June of 1984. Both of those agreements were executed by both Taylor and Head in North Carolina. Taylor's release of Head in June of 1984 from his promise to contribute to the support of his children was clearly conditioned upon Head's agreement to assume custody of the children at that time. He reneged on his promise to do so when he ordered Christopher to leave his home in July of 1987. Consequently, we hold that the North Carolina trial court acquired personal jurisdiction over Head in 1987 pursuant to N.C.G.S. § 1–75.4(5) when he was served with copies of Taylor's Motion for Custody and Child Support by certified mail in accordance with Rule 4(j) of the North Carolina Rules of Civil Procedure.

## III.

Under the Due Process Clause, the test to be applied to determine whether North Carolina validly exercised personal jurisdiction over Head is whether he had "certain mini-

mum contacts with [North Carolina] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278, 283 (1940)). We observed in *Camelback Ski Corp. v. Behning,* 307 Md. 270, 274, 513 A.2d 874, 876 (1986) *on remand* 312 Md. 330, 539 A.2d 1107 (1988):

> "As the Supreme Court acknowledged in *Kulko v. California Superior Court,* 436 U.S. 84, 92, 98 S.Ct. 1690, 1696, 56 L.Ed.2d 132 (1978), this standard is not susceptible of mechanical application, and the facts of each case must be weighed to determine whether the requisite 'affiliating circumstances' are present:
>
>> We recognize that this determination is one in which few answers will be written 'in black and white. The greys are dominant and even among them the shades are innumerable.' *Kulko, supra,* 436 U.S. at 92, 98 S.Ct. at 1696 (citation omitted)."

In *Kulko* the California courts had exercised personal jurisdiction over a New York resident whose wife had sued him for an increase in child support. The Court (6–3) held that under the circumstances of that case such exercise of jurisdiction offended the Due Process Clause. The jurisdictional facts of *Kulko* are in sharp contrast to those presented in the instant case.

Kulko (husband) married his wife in 1959 while he was on a three day stopover in California on his way to a tour of military duty in Korea. At that time both were domiciled in New York. Following the marriage the wife returned to New York; the husband joined her there after his tour of duty was completed. Their children, Darwin and Ilsa, were born in 1961 and 1962. The family resided in New York until 1972 when the husband and wife separated.

The wife then moved to California. The parties entered a separation agreement in September of 1972 which was

executed by both in New York. Immediately after the separation agreement was executed, wife flew to Haiti and procured an absolute divorce. The divorce decree incorporated the terms of the separation agreement. That agreement provided that the children would live with the husband during the school year but would spend their Christmas, Easter and summer vacations with the wife. Husband agreed to contribute to the children's support while they were staying with the wife. That custodial arrangement was followed until December of 1973 when Ilsa told her father that she wanted to live with her mother. Husband acceded to that request; thereafter, Ilsa lived with her mother during the school year but spent some time with her father.

In January 1976 the parties' other child, Darwin, telephoned his mother and told her that he wanted to live with her. Without husband's knowledge, wife sent an airplane ticket to her son which he used to fly to California to take up residence with his mother and sister. Soon after Darwin arrived at wife's home in California, she sued husband in California. She sought to establish the Haitian divorce decree as a California judgment, to modify that judgment so as to award custody of her children to her, and to increase husband's child support obligations. Husband unsuccessfully challenged the jurisdiction of the California trial court to enter a child support order against him. The Supreme Court of California ultimately affirmed the trial court's judgment.

In reversing, Justice Marshall, speaking for the majority, emphasized the minimal contacts which husband had with the forum state. He and his wife had been married there, but he had only visited California on two occasions, once for three days in 1959, when he was married, and again for 24 hours in 1960. Furthermore, the parties were domiciled in New York from the time of their marriage until their separation. Their separation agreement was executed there.

The majority opinion also reasoned that

"basic considerations of fairness point decisively in favor of appellant's [husband's] State of domicile as the proper forum for adjudication of this case, whatever the merits of appellee's underlying claim. It is appellant who has remained in the State of the marital domicile, whereas it is appellee who has moved across the continent. *Cf. May v. Anderson,* 345 U.S. 528, 534–535, n. 8, 73 S.Ct. 840, 843–844, n. 8, 97 L.Ed. 1221 (1953). Appellant has at all times resided in New York state, and, until the separation and appellee's move to California, his entire family resided there as well. As noted above, appellant did no more than acquiesce in the stated preference of one of his children to live with her mother in California. This single act is surely not one that a reasonable parent would expect to result in the substantial financial burden and personal strain of litigating a child-support suit in a forum 3,000 miles away, and we therefore see no basis on which it can be said that appellant could reasonably have anticipated being 'haled before a [California] court,' *Shaffer v. Heitner,* 433 U.S. [186] at 216 [97 S.Ct. 2569, 2586, 53 L.Ed.2d 683]."

*Id.* 436 U.S. at 97–98, 98 S.Ct. at 1699–1700, 56 L.Ed.2d at 144–45.

■ In the instant case, when Taylor and Head separated, they and their children had been domiciled in North Carolina for four years. Their separation agreement was executed there as was the supplemental agreement of June, 1984. It was not unreasonable for Head to anticipate being haled before a North Carolina court in child support litigation arising out of those agreements. Taylor and the children continued to reside there until she and Head entered the supplemental agreement in June of 1984. At that point Head agreed to assume custody of the children and Taylor relinquished any claim for child support from Head. Until December 1984, Head was the co-owner of the dwelling occupied by Taylor and the children. Taylor has never abandoned her domicile in the forum state. Christopher

returned to her home in that state when Head turned him out of his home in Maryland.

We hold that Head's involvements with North Carolina satisfy the "minimum contacts" test of *International Shoe Co. v. Washington, supra,* as explicated in *Kulko v. California Superior Court, supra.* Where similar connections have been present, other state courts have sustained long arm personal jurisdiction to enforce child and spousal support obligations. *See, e.g., Yery v. Yery,* 629 P.2d 357 (Okl.1981); *Khan v. Superior Court,* 204 Cal.App.3d 1168, 251 Cal.Rptr. 815 (Cal.App. 1 Dist.1988); *In re Marriage of Lontos,* 89 Cal.App.3d 61, 152 Cal.Rptr. 271 (Cal.App. 4 Dist.1979); *In re Marriage of Hattis,* 196 Cal.App.3d 1162, 242 Cal.Rptr. 410 (Cal.App. 4 Dist.1987); *In re Marriage of Highsmith,* 130 Ill.App.3d 725, 86 Ill.Dec. 1, 474 N.E.2d 915 (1985), *aff'd,* 111 Ill.2d 69, 94 Ill.Dec. 753, 488 N.E.2d 1000 (1986); *Paparella v. Paparella,* 74 A.D.2d 106, 426 N.Y.S.2d 610 (1980); *Oliver v. Boutwell,* 601 S.W.2d 393 (Tex.Civ.App.1980); *Crockett v. Crockett,* 589 S.W.2d 759 (Tex.Civ.App.1979). The Due Process Clause did not prohibit North Carolina's exercise of personal jurisdiction over Head to enforce his duty, which he performed pursuant to agreements with Taylor until July of 1987, to support his minor child.

JUDGMENT REVERSED, CASE REMANDED TO THE CIRCUIT COURT FOR HARFORD COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.